THE NORTH AVENUE LAND COMPANY ET AL. *vs.*
THE MAYOR AND CITY COUNCIL OF BALTI-
MORE.

*Specific Performance—Inability of Vendor to. Convey Title Within a
Reasonable Time—Rescission by Municipality of Contract. to Buy
Land.*

In a contract for the sale of a tract of land to a municipality for a reser-
voir site, which both parties understood to be urgently needed, time is
of the essence, and the vendor is not entitled to specific performance
of the contract when he fails to perfect his title to part of the land until
several months after the time fixed by the contract for the conveyance.

When a purchaser has rescinded a contract to buy land on account of the
delay of the vendor to acquire title thereto for several months after the
time stipulated for making the conveyance, such rescission being justi-
fied by the delay, the fact that the vendor afterwards acquires title and
offers to convey does not operate to revive the contract.

Certain municipal officials accepted an offer from C to sell a certain tract
of land containing 114 acres to be used as a reservoir site for storing
water. C offered 92 acres of the tract as holder of an option for its pur-
chase from certain trustees, and the remainder he offered as the agent
of two different owners    C's offer stipulated that the purchase-money
should be paid within sixty days from its acceptance, subject to the al-
lowance of further reasonable time for the examination of the title to

land. This contract with the city was made in May, 1903. When the trustees from whom C had agreed to purchase the 92 acres reported the sale to the Court of equity in which their trust was being administered, exceptions were filed and the sale was set aside. In July, 1903, the municipality notified C that they repudiated the acts of the officials in accepting his offer; and in January, 1904, a municipal ordinance was passed repealing the contract. In August, 1904, C made another contract with the trustees owning the 92 acres by which he became entitled to convey the same, and afterwards the bill in this case was filed by C and the other two vendors asking for specific performance of the contract made in May, 1903, to purchase the land. *Held*, that, assuming the validity of the original contract to purchase and that it could not be rescinded by the city, yet that contract required the land to be conveyed and the payment to be made within sixty days; that C had a reasonable time thereafter in which to perfect his title, and having failed to do so for more than a year, and time being of the essence of this contract, the plaintiffs are not entitled to specific performance and the municipality was authorized to rescind the contract.

*Held*, further, that the city was not a party to the agreement of August, 1904, by which the trustees were authorized to sell the 92 acres to C, and that agreement affords no ground for the relief sought in this case.

*Held*, further, that since the contract was an entire one for the purchase of 114 acres from three different parties, and no conveyance could be made of 92 acres within the stipulated time, the other vendors are not authorized to ask for performance of the agreement to purchase the remaining portions of the tract.

Appeal from the Circuit Court of Baltimore City (DENNIS, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Michael A. Mullin*, for North Avenue Land Co., appellant.

*James P. Gorter* for F. H. Callaway, appellant.

*William L. Marbury* (with whom was *Charles H. Stanley* and *Hubner & Hubner* on the brief), for Fielder C. and Frank Slingluff, trustees, appellants.

*Edgar Allan Poe, Deputy City Solicitor*, and *Albert C. Ritchie, Assistant City Solicitor* (with whom was *W. Cabell Bruce, City Solicitor*, on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City dismissing the bill of complaint of the North Avenue Land Company, George R. Vickers, Jr., trustee, Frank H. Callaway, and Fielder C. Slingluff and Frank Slingluff, trustees, against the Mayor and City Council of Baltimore, which sought to require of the defendant the specific performance of an alleged contract for the purchase of land to be used as a reservoir site. Some questions affecting the contract were before us in *Callaway* v. *Baltimore City*, 99 Md. 315, and *Callaway* v. *Hubner, Ibid,* 529, and the case of *Vickers* v. *Baltimore City* was argued with this. The latter is an appeal from a decree sustaining exceptions to a sale of a part of the land involved and will be disposed of in a separate opinion.

The city relied on numerous grounds to sustain the decree of the Circuit Court but, although they were argued with great ability on both sides, it will be unnecessary for us to pass on all of them in view of the conclusion we have reached, which determines the controversy, regardless of many questions raised. It is conceded that for sometime prior to the execution of the option hereinafter considered, the authorities of the city of Baltimore had concluded that additional reservoir capacity for the storage of clear water had, to use the language of Mr. Quick, the Water Engineer, become "of imperative necessity." That was not only deemed necessary by reason of there being long periods during which the Gunpowder river, from which the water supply is obtained, was very muddy, but an additional clear water storage-reservoir was "an imperative necessity" in order to insure water to what is called "the high service district which comprises about one-third of the city's area, as well as its population." According to the evidence, the available reservoir capacity was scarcely sufficient for two day's supply for that territory, and that was dependent upon pumping. In the event of an accident which would put the pumps out of service for several days there was great danger of exhausting the supply. Such an emergency had arisen twice within the period of six years prior to the

time Mr. Quick testified (August, 1903), and the supply of water was so low in the high service district "that hundreds of people had to go to the parks, wells and fountains and to private wells elsewhere, to get water." Mr. Quick concluded his testimony on this point by saying: "So that a break at the pumps, or at the force mains, that would take over two days to repair, or three days or more, would undoubtedly result in a water famine in a district covering about one-third of the city." An Act of the Assembly was passed (1902, ch. 333), to enable the city to issue stock to an amount not exceeding one million dollars for the betterment, enlargement, increase and improvement of the water service and supply, by the construction of an additional storage reservoir, the extension of the service, etc. An ordinance was passed in pursuance of that Act which was ratified by the voters at the election held in November of that year. The Ordinance of Estimates for the year 1903, approved December 8th, 1902, appropriated three hundred and fifty thousand dollars for the acquisition, by the Mayor, Comptroller and Water Engineer, of land for a new reservoir, and the cost of its construction. Even prior to the passage of the Act of Assembly the city authorities were investigating reservoir sites and other matters connected with the proposed improvements, and what is known in these proceedings as the "Callaway Site" was one of several under consideration. The commission, composed of the three officers named, organized in December, 1902, and met a number of times. Mr. Quick made borings on the several sites, to ascertain the character of the soil, etc., and on May 14th, 1903, he made a report to the commission stating the results, and recommending what is spoken of as the "Williams Site." He furnished copies of his reports to the Mayor and Comptroller and the commission again met on May 16th. At that meeting the Mayor and Comptroller voted in favor of the Callaway site at $2,000 per acre—Mr. Quick voting in the negative. Mayor Hayes then produced an option on the Callaway site which he and Comptroller Smith accepted. That is dated the 15th day of May, 1903, is signed by Mr. Callaway and "rati-

fied upon the part" of the Slingluff estate by the signatures of the two trustees, Messrs. Fielder C. and Frank Slingluff, on the part of the Vickers' estate by George R. Vickers, Jr., trustee, and by the North Avenue Land Company on its part.  It gave the Mayor and City Council of Baltimore the option of purchase, on or before the 18th day of May, 1903, at $2,000 per acre, of (1) fifty-eight acres of a tract of ninety-two acres. (with the privilege of taking the whole of it) "described in the petition and report of Fielder C. Slingluff and Frank Slingluff, trustees, in the case of *Fielder C. Slingluff et al.* v. *C. Bohn Slingluff et al.*, made and reported to the Circuit Court of Baltimore City, as a six months' option to the said Frank H. Callaway and by said Court authorized on the 24th day of December, 1902;" (2) twelve acres belonging to the estate of George R. Vickers, deceased, and (3) ten acres of the North Avenue Land Company tract.  Mr. Callaway also agreed to convey certain rights of way therein referred to.

The acceptance by the Mayor and Comptroller recites a resolution of the commission and mentioned the terms of purchase—being the same stated in the option.  The petition of the Slingluff trustees reported that they had an offer from Callaway of $700 per acre; that they believed it would be "a most advantageous sale if they can dispose of the entire ninety-two acres above described, or any portion thereof, at the rate of seven hundred dollars per acre," and prayed the Court to authorize them to grant Callaway an option for six months on the entire portion, or so much as he may want, upon final ratification of sale by the Court.  That petition was accompanied by a certificate of two real estate brokers, certifying that in their opinion the price was "an extremely good" one for the property in question.  On December 24th, 1902, the Court authorized the trustees to give the option for six months, which they did by a writing dated December 26th.  On June 10th, 1903, Callaway notified the trustees that he accepted the option, and asked them to take such steps as were necessary to convey to him the fee-simple title.  On June 25th they reported the sale to the Court, which was set aside by order of

December 29th, 1903, which order was affirmed by this Court
on June 9th, 1904.   In 1903 Mr. McLane was elected Mayor
and Mr. Heffner Comptroller, and on July 20th, 1903, they
notified Mr. Callaway, that the Mayor and City Council of
Baltimore repudiated the acts of the commission, especially of
the majority in accepting the option, and on January 14th,
1904, an ordinance was passed repealing the appropriation of
$350,000, so much of the Ordinance of Estimates as purported
to authorize the Mayor, Comptroller and Water Engineer to
acquire land for the new reservoir, etc.

Under these facts and others established by the record,
some of which we will refer to, are the appellants entitled to a
decree for specific performance, even if it be conceded that
the action of the Mayor and Comptroller did bind the city,
and that the contract could not be rescinded, at the mere dis-
cretion of the Mayor and Council, without some sufficient
cause for such action?   It is scarcely necessary to repeat the
general principles applicable to relief by specific performance,
but in *Bamberger* v. *Johnson*, 86 Md. 41, after saying that the
application for such relief "is addressed to the sound discre-
tion of the Court, to be granted or refused according to its
circumstances; it does not flow as a matter of right," this
Court approved a quotation from *Fry on Spec. Per.*, sec. 44,
which it may be well to bear in mind.   It is there said that
"The meaning of this proposition is not that the Court may
arbitrarily or capriciously perform one contract and refuse to
perform another; but that the Court has regard to the con-
duct of the plaintiff and to circumstances outside the contract
itself, and that the mere fact of the existence of a valid con-
tract is not conclusive in the plaintiff's favor."   We have seen
that it was deemed by the city authorities "an imperative ne-
cessity" to have a new reservoir for the storage of clear water,
and the testimony of Mr. Quick and of ex-Mayor Hayes shows
that time was not only material, but was of the very essence
of the contract.   It cannot be doubted that before Mr. Calla-
way had obtained the acceptance from the Mayor and Comp-
troller he was aware of the importance to the city of a speedy

consummation of such purchase as would be made. On March 6th, 1903, in a letter addressed to the secretary of the commission, he said: "I can also give a guaranteed, merchantable, fee-simple title to the entire property, and am also ready to sign the necessary papers, *give immediate possession absolutely free from all condemnation.*" That particular expression was not used in the option he gave the Mayor and City Council, but he limited the option to "the 18th day of May, 1903"—just three days after the date of his offer—and it was therein provided that "the purchase-money for said land to be paid within sixty days from the date of the acceptance of this option without interest, unless further time be required by the City Law Department for the examination and perfection of the titles to said land and rights-of way, in which event *further reasonable time* shall be given for that purpose, *provided* that the said Callaway in his own right and those for whom he is acting as agent are ready to execute and deliver a good and merchantable title by deed in fee-simple to said land intended to be conveyed." It is clear then that the agreement contemplated that the city should pay the purchase-money and that Callaway and those for whom he was acting should convey the property within sixty days, unless further time was required by the City Law Officers for the examination and perfection of the title, and in that event "*further reasonable time*" was to be given for the payment *and the conveyance.* At the end of the sixty days (July 15th, 1903) Callaway and others were unquestionably unable to convey a good and merchantable title to the property, for within that time the sale of the ninety-two acres had been reported to the Court by the trustees of the Slingluff estate and exceptions had been filed which were still pending. We do not refer to the exceptions to the sale reported by Mr. Vickers as that was excepted to by the city, which action might present other questions as to that, but the city had nothing to do with the exceptions to the sale of the Slingluff property. After considerable testimony was taken, those exceptions were finally heard and on December 29th, 1903, they were sustained, and

the sale set aside.   That was over five months after the expiration of the sixty days.  Mayor McLane and Comptroller Heffner (who had been elected before and qualified three days after the acceptance of the option by Mayor Hayes and Comptroller Smith) notified Mr. Callaway on July 20th, 1903, that the Mayor and City Council of Baltitimore repudiated the acts of the commission.   If it be conceded, as we will do for the purposes of the question we are considering, that such action on their part could not at that time have bound Callaway or have affected such rights as he ·acquired by the acceptance of the option, he at least knew the position the officers of the new administration were taking, and cannot complain that he was induced to incur additional expense by reason of anything done by them.   On January 14th, 1904—six months after the expiration of the sixty days referred to in the option—the ordinance was passed repealing the appropriation and in substance denying the city's liability under the contract.   Callaway was fully advised as to that, as appears by the case of *Callaway* v. *Baltimore*, 99 Md. 315, in which he sought to enjoin the Mayor and City Council of Baltimore from doing anything under the ordinance, and from attempting to set aside, disregard or evade the obligation of the contract of May 16th, 1903, until the exceptions in the Vickers and Slingluff cases were finally determined.

But he took an appeal from the decree setting the Slingluff sale aside, and in March 1904 had the record in that case transmitted to this Court.   As Mr. Callaway had a profit of $1,300 per acre—the difference between what he was to pay the Slingluff estate and what he was to receive from the City—, less such expenses as he incurred, it was perhaps natural for him to exhaust all efforts to acquire the property under his original agreement with the trustees, but was he to be permitted to thus continue the contest for these large profits, and in the meantime hold the City authorities to the original contract of May 16th, 1903, when he knew that one-third of the City of Baltimore was liable to be deprived of water for the want of a new reservoir?   It was said in *Coleman* v. *Apple-*

*garth*, 68 Md. 28, "If the parties have, as in this case, expressly treated time as of the essence of the agreement, or if *it necessarily follows from the nature and circumstances of the agreement that it should be so regarded*, Courts of equity will not lend their aid to enforce specifically the agreement, regardless of the limitation of time." What circumstances would more fully justify the Court in regarding time as of the essence of the contract than such as we have here ? As we have seen, Callaway had at most only a *reasonable* time after July 15th, 1903, to perfect the title. What is a reasonable time must be determined by the circumstances of the particular case in which such question is involved. A delay of a month under some circumstances might be unreasonable, whilst under others that of a year or more would not be so regarded. But in this case the comfort, health and protection from fire of one-third of a large city were liable to be affected by delay in securing an additional water supply, as was well known to the contracting parties, and six months after the contract was intended to be performed, according to its terms, one of the contracting parties was not only without title to the major part of the land, but all of his interest in and right to it was gone, unless he succeeded in reversing the decree of the Court having jurisdiction over the trust. So far as disclosed he did not even then show any disposition to surrender any part of the enormous profit he was seeking to make and thereby induce the interested parties to secure to him the power to convey the land, but he persistently contended for the right to pay seven hundred dollars per acre for land which he had contracted to sell to the City at two thousand dollars per acre, although that controversy could not in due course be determined by this Court for five or six months from the date of the decree of the lower Court, as the record was not transmitted until shortly before the April term began. Then when the decree was affirmed by us (June 9th, 1904)—thereby leaving him wholly without interest in or right to the ninety-two acres—there was another delay of two months before the new option was sanctioned by the Circuit Court. The fact

that he did succeed in procuring the consent of the benefici-
aries and of the Circuit Court, when he agreed to be content
with about one-third of the purchase money to be obtained
from the City, and to give the remainder to the estate, instead
of keeping nearly two-thirds for himself and giving the estate
the balance, as his original option authorized, is a strong in-
dication that he might have acquired those ninety-two acres
within a reasonable time—within a short time—if he had dealt
more liberally with the Slingluff estate in the first instance.
Instead of that he pursued the other course and spent a year
from the time he accepted the option (which was near the end
of the six months given him to accept it) in endeavoring to
compel those interested to accept what has since been judi-
cially determined to have been an inadequate price.

Under such circumstances it seems clear to us that a Court
of equity ought not to compel the city to take the property,
regardless of other questions.   It is true that we said in
*Maryland Construction Company* v. *Kuper*, 90 Md. 529, that
it was not necessary that a vendor should possess a market-
able title to property at the time the contract is entered into—
provided he shows that he made the contract in good faith
and is able to convey it when called upon by his agreement to
do so ; and that he may only be required to be able to convey
it by the time the decree is entered, if time is not of the essence
of the contract.    But the appellant's case does not measure
up to such standards.   Mr. Callaway was not "able to convey
it when called upon by his agreement to do so" for he was
called upon to convey the entire property *at least* within a
reasonable time from July 15th, 1903, and as he could not do
so within six months after that time, and especially as the
court having jurisdiction over the trust had set aside the sale,
and thereby terminated all his interest in the property, the
city had the right to take the action it did on January 14th,
1904, and to refuse to take the property.    It was under no
obligation to wait five or six months longer to have the excep-
tions to the sale passed on by this Court.    The conditions
were such as required prompt action on the part of the auth-

orities and it was altogether unreasonable to expect them to wait a year or more from the time they agreed to purchase, to enable Mr. Callaway to consummate the purchase of the Slingluff property.    If there could be any doubt about that, the affirmance of the case of *Callaway* v. *Hubner* was certainly sufficient to justify the appellee in refusing to be any longer bound by the action of the commission.

If the city had attempted to procure a decree for specific performance against Callaway at any time between December 29th, 1903, and August 8th, 1904, it would have failed, as he could not perform, and he had fully disclosed in his offer what interest he had in the property, and how he held it.    His offer which the Mayor and Comptroller accepted made the petitition of the trustees, the order of Court and the option given by the trustees in pursuance of that order parts of it. The order of the Court expressly made the sale dependent "upon the final ratification of sale by this Court."    The refusal by the Court to so ratify the sale would therefore have been a complete answer to any application for specific performance by the city, and it would be extending the doctrine applicable to this form of relief beyond what has been done by any authority we are aware of, and beyond what we deem reasonable and just, and to hold that, *under such circumstances*, the city was nevertheless required to wait until the appeal had been heard, and then when decided against the vendor, to still wait until he could negotiate for or procure another option.    In the meantime public interests of great moment might be suffering by reason of the delay.    This litigation has doubtless already delayed the city authorities to an extent that may prove to be to the great inconvenience of many of the inhabitants ot Baltimore, if Mr. Quick's and Mayor Hayes' views of the necessity for another reservoir were correct, and if the doctrine be announced by Courts of equity that when a municipality once enters into a contract such as this, it cannot be discharged from it until the vendor gets through with protracted litigation (in the lower and appellate Courts) with other parties, and even then must wait until he has made other terms with those

parties, it would seriously obstruct many needed improvements and be greatly to the detriment of the interests of the public. The city was not a party to the agreement authorized by the order of the Circuit Court of August 8th, 1904, and that agreement cannot be used as the foundation for the relief sought. As in our opinion the city was prior to that time released from all obligation to purchase under the agreement of May 16th, 1903, of course that of August 8th, 1904, to which it was not a party and was in no wise responsible for, did not revive that obligation.

We have not thought it necessary to discuss the question suggested at the argument—that the trustees had the power to sell this property under the will of Mrs. Slingluff without ratification of the sale by the Court. In point of fact they did report it to the Circuit Court for its ratification and not only that Court set the sale aside but this Court sustained its action. It would therefore be useless to determine whether the trustees might have sold it without ratification by the Court, for it could scarcely be contended that after trustees report a sale to a Court of equity, which had previously assumed jurisdiction over the trust, and on objection by parties in interest the sale is set aside, they could still sell it on the same terms, notwithstanding the action of the Court. But beyond all that this agreement clearly contemplated that the sale should be ratified by the Court, for it expressly referred to the order of the Court which in terms provided for its ratification.

The option of May 15th, 1903, after describing the three properties—those of the Slingluff estate, the Vicker's estate, and of the North Avenue Land Company—and saying that the land was to be free and clear of all liens, etc., states that *"all said lands shall be in one body,"* and shows conclusively that it was an option on the *whole*, and not for any one of the three tracts. An exhibit was filed with it, marked "Exhibit Callaway, No. 5," which gives the courses and distances of the entire tract, made up of the three, containing about 114. acres. The acceptance of Mayor Hayes and Comptroller Smith was for the site for a new reservoir offered in the option,

"and more particularly described in 'Exhibit Callaway, No. 5, attached to said option, containing about one hundred and fourteen acres." The resolution passed by them refers to the same exhibit. There can therefore be no question that the proposed purchase was of the whole and not simply of one or two of the three tracts. As it was known to be for a reservoir site, of course if the Slingluff tract containing ninety-two of the hundred and fourteen acres was not conveyed, the city could not have been required to take the balance, even if it had not been so expressly stated in the option and acceptance.

Being of the opinion that the appellants are not entitled to the relief sought for the reasons we have stated, the decree will be affirmed.

*Decree affirmed, appellants to pay the*
*costs.*

(Decided January 9th, 1906.)