# ISAAC L. NEWMAN et al. *vs.* CLINTON M. JOHNSON.

*Specific Performance—Laches of Plaintiff Disentitles Him to Relief.*

When a purchaser of land alleges that a release of a supposed interest is necessary to perfect the title, and this is denied by the vendor, the purchaser should elect either to accept the title without the release or to cancel the contract. He cannot delay and afterwards, when the vendor has agreed to sell the land to third parties, waive his objection to the title and file a bill for specific performance.

The purchaser under an agreement for the sale of land failed for five months to fulfill his promise to pay the price, alleging, as one of the reasons therefor, that a third party had an easement in a portion of the land which should be released in order to make the title clear. The vendor denied the existence of such easement and refused to procure a release and the purchaser finally waived the requirements. The vendor then notified the purchaser in writing that if the purchase money was not paid within three days, the contract would be treated as cancelled.

No answer was made to this notice and the day after the expiration of the time limited the vendor agreed to sell the land to another person. A few days afterwards the purchaser filed the bill in this case for specific performance.   *Held,* that under these circumstances, the plaintiff is not entitled to relief asked for.

*Decided June 25th, 1908.*

Appeal from the Circuit Court, No. 2, of Baltimore City (GORTER, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and WORTHINGTON, JJ.

*William P. Lyons* and *Vernon Cook,* for the appellant.

*Richard Bernard* and *Wm. G. Towers* (with whom were *S. S. Field* and *Alfred D. Bernard* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

The bill in this case was filed by the appellee against the appellant to enforce the specific performance of a written contract between them for the purchase by the appellee of a parcel of land in Baltimore City belonging to the appellant. This contract was executed March 13th, 1907, the appellant being named and described therein as vendor, and the appellee as vendee, and the property being accurately described. The material recitals are these:

"That the said vendor has this day sold to the said vendee, and that the said vendee has this day bought of the said vendor, at and for the sum of ten thousand dollars ($10,000) in fee simple, all that lot of ground and improvements situate in Baltimore City and described as follows. (Description omitted here.)

"The title to all of the above described property to be good and marketable, and the said property is to be free of all liens and claims, otherwise this agreement is to be null and void, and the money paid hereunder is to be returned to the said

vendee.   Taxes to be adjusted and allowed to the date of transfer of title.   The two hundred and fifty dollars ($250) of said purchase price of ten thousand dollars has been paid before the signing hereof, the receipt whereof is hereby acknowledged, and the balance of said purchase price is to be paid as soon as the examination of title is completed, for which a period of thirty days is allowed."

The contract further provided that upon full payment of the purchase money, the property should be conveyed to the vendee by the vendor, at the cost of the vendee, by a deed giving a good and merchantable title, subject to certain restrictions as to the buildings to be erected thereon, and the use to be made thereof, which are not material to the case.

The property extends from the center of Kate avenue to the center of Grace avenue, and binds upon the east line of the right of way of the Western Maryland Railroad.   The vendee opened negotiations for the purchase through W. L. Russell, as agent for the vendor, in the spring of 1906, but it does not appear that the vendee's name was disclosed to the vendor until sometime in January, 1907.   In the meantime, the negotiations producing no result, the vendor wrote Mr. Russell on January 11th, 1907, that he had other inquiries about a part of the tract, which he could not answer without interfering with Russell's client, and he would therefore withdraw his offer of sale after January 31st, 1907, unless, before that date they said positively they wanted the property and put up a forfeit.   As a result of this, the vendee on January 31st, 1907, signed an agreement prepared by him, and which Russell signed as agent for Newman, and the vendee gave his check for $250 in part payment.   This agreement was not satisfactory to the vendor, who before signing a contract, thought it necessary to get in what he thought might be outstanding interests, and after this was accomplished, the agreement of March 13th was prepared and executed by the parties, the vendee's check in the meantime being retained by Russell, and being delivered to the vendor on March 13th.   This check was not honored when presented that day, and was not

made good, according to the vendor's testimony, for several
days, but it was then paid, and appears to have been over-
looked by the vendee through inadvertence merely.    That in-
.cident will therefore be dismissed.

The vendee then employed Mr. Towers as his attorney to
examine the title, and he deemed it necessary or proper to
have certain relatives of the vendor make conveyances to him
to cover some possible interest they might be supposed to
have.    One of these conveyances was recorded April 8th,
1907, but the other was not recorded· until May 31st.    Mr.
Towers, also, before the thirty days for examination of title
expired, says that he informed the vendor he had discovered
a deed upon record creating an easement in a strip of said
land in favor of the Western Maryland Railroad for the main-
tenance of a station thereon; but the vendor testifies that this
was not made known to him until April 13th when he called
for a settlement, and that he was not convinced until he saw
the deed that there was such a paper.    By the terms of that
deed, it appears that whenever the railroad company should
cease to maintain a station upon said strip of ground, it should
revert to the estate of L. P. D..Newman, to whose title the
vendor had succeeded.    It appears from the record that the
station and platform erected on said strip under the said deed,
had been abandoned and removed about 1896, when the Park
Heights Electric Railroad was built, and since then there has
never been a station there; nothing but the single track of
rail, until 1906, when a switch was put in at that point on a
fill made for that purpose, *but as the record shows, wholly upon
the right of way of the railroad.*    The vendor's land and the
surrounding lands were all unenclosed, and after the con-
struction of this switch, persons drove across the vendor's
land in going to this switch as they had before done in going
to the station and platform.    In reference to this matter there
is a conflict of testimony, the vendee claiming, as alleged in
his bill of complaint, and in his testimony, that the vendor
agreed to get a release from the railroad company and from
that time down to the filing of his bill, the delay was due to

the vendor's failure to procure the release, and that he had always been, and still was ready to pay the purchase money upon receipt of a clear, merchantable title.

The vendor on the other hand denied in his answer and also in his testimony, that any such promise was ever made by or for him; he denied that the railroad company had any existing easement or right, alleging it had long since been abandoned, and that the use and title had reverted to him as the successor in title of the said L. D. P. Newman and his trustees; and that as soon as he was informed of the claim made by Mr. Towers that a release was deemed necessary to perfect the title, he had replied he would not ask a release from unfounded or imaginary claims, and that the vendee subsequently said he would procure it himself, and that the vendor need give it no further thought. The vendor further answered, and testified that from that date, April 13th, to September 27th, he was constantly urging the vendee to close the transaction, and that the delay was wholly due to the financial inability of the vendee to carry out the contract. The evidence very strongly sustains the vendor's assertion that he denied the existence of any easement or right of the railroad, and that he positively refused to put himself in the position of recognizing any foundation for such claim of the railroad company by asking a release. Under these circumstances, if the vendee deemed such release necessary for his protection, his alternative was either to procure it himself from the railroad company and complete his contract with the vendor, or treat it as broken by the refusal of the vendor to procure it, and his failure to convey a title free from all liens or claims, and as entitling him to a return of the money paid, and to such damages for the breach of the contract as he should be able to show.

The vendee testified that he was from May until the last of September constantly expecting the vendor to procure a release from the railroad and that though he was not personally prepared with the money, he had the promise of a responsible man, Mr. Kelley, to furnish it whenever required, and that the only delay was due to his waiting on the vendor to procure the re-

lease from the railroad.    This contention however is not con-
sistent with important and  uncontradicted evidence in the
record.    On June. 19th, 1907, the vendor's attorneys, Messrs.
Gans & Haman, wrote the vendee that they were instructed to
say that unless the contract was performed by him not later
.than June 30th, a bill would be filed against him for specific
performance.    The receipt of that letter was admitted by the
vendee, and that · no reply was made thereto by or for
him.    He contented himself with referring it tò his attorney.
The vendor testified that this bill was not actually filed, be-
cause he was satisfied that the vendee was not financially re-
sponsible, and a decree would be unavailing if obtained.    Mr.
Kelly did testify that he would ha7e financed the purchase for
the vendee if required, though under no legal obligation to do
so, and that he would in that event have secured himself on
the property, but that under the proposed'arrangement, much
assistance would not have been requred of him.    It is quite
clear that Mr. Kelly was abundantly able to finance this pur-
chase, and it is true that he furnished the $10,286.25 paid into
Court after this suit was brought.    But it is reasonably clear
from all the evidence taken together that the vendee's original
.reliance for the money was in *selling* a part of the tract to Mr.
Kelly, and that after Mr. Kelly bought another place suited
to his purpose, he then relied upon selling a part to some other
person, and that no positive arrangement was ever made with
Mr. Kelly until about the time the money was to be paid into
Court.    .Mr. Pentz testified that during May and June, Mr.
Johnson several times endeavored to sell him the larger part
of the property, at least six or eight times; and on July 19th,
he did enter into an agreement with a Mr. Hoffman to sell
him about one-fourth of the property for $7,500, and actually
received from him $500 on account of the contract.    On Au-
gust 12th, Hoffman applied to the Title Guarantee & Trust
Co. to examine the title, and Mr. Towers also applied for the
same purpose on August 31st, and on October 1st the Title
Co. reported to Mr. Towers by letter the result of a partial
examination in which several objections were made, including

the matter of the easement of the railroad. Mr. Newman testified that from April to September he was urging Mr. Towers every two or three days, and that the reply always was it would. have to go over a day or two, and that the last excuse for the delay was that Hoffman had been disappointed in getting the money on mortgage, and that Johnson told him on August 21st that he had made satisfactory arrangements with the railroad, but that his plans to finance the matter had all failed so far, but that on September 1st Hoffman would be in position to settle with him and he could then settle with Newman, and that Newman consented to wait till that time.

Mr. Towers was not called in rebuttal of Mr. Newman's testimony on this point; Mr. Johnson was called, but was not interrogated on that point, and made no denial. The first of September arrived and nothing was done. On September 24th or 25th, Mr. Newman was on Kate avenue, adjoining this property, when he met a Mr. Flanigan who had a contract to grade Kate avenue, and asked him what he would take for it as he wanted it to dump his waste earth upon it. Newman told him he had an agreement to sell it to Johnson for $10;000, who had been fooling over it a long while, and that he would like to sell it to Flanigan, but must first ascertain whether he was relieved from Johnson's contract. Flanigan said he would take it at that price, but must have an answer by the next Monday. Newman consulted his counsel, Mr. Cook, who advised him he could proceed with Flanigan; and he then wrote Johnson a letter, September 27th, stating that the performance of the contract had been delayed over five months and that unless the purchase money was paid by noon on September 30th he should treat the contract as cancelled and at an end, and this letter was sent by registered mail, and Mr. Towers was acquainted by Newman with its contents. No answer appears to have been made to this letter by any one, but after its receipt, Mr. Towers met Mr. Horsey, of Gans & Haman, and asked him what Newman was going to do, and he replied, "stand by the letter," to which Mr. Towers answered "all right."

On October 1st Newman entered into a written contract with Flanigan to sell him this property for $10,250, and $500 was paid on account, the balance to be paid on execution of a conveyance.

The bill in this case was filed on October 15th.

With this statement of the principal facts we are prepared to consider the law governing them.

It has been many times said, as in *Bamberger* v. *Johnson*, 86 Md. 41, that the application for this relief "is addressed to the sound discretion of the Court, to be granted or refused according to its circumstances. It does not flow as matter of right." And in *North Avenue Land Co.* v. *Balt. City*, 102 Md. 480, the Court, quoting and approving sec. 44 of *Fry on Specific Performance*, said, "The meaning of this proposition is not that the Court may arbitrarily or capriciously perform one contract and refuse to perform another; but that the Court has regard to the conduct of the plaintiff and to circumstances outside the contract itself, and that the mere fact of the existence of a valid contract is not conclusive in the plaintiff's favor." This principle was applied and emphasized in the recent case of *The Gunther Brewing Co.* v. *Brywczynski*, 107 Md.

In *Canton Co.* v. *Northern Central Railway Co.*, 21 Md. 383, it was held that there must be a full and candid disclosure of all the facts in the bill, and that if this is not done, the Court may refuse to grant the relief sought. The allegations of the bill in this case are very meagre and when contrasted with the facts as disclosed by the evidence, we do not think they measure up to the standard of a full and candid disclosure. In *Penn* v. *McCullough*, 76 Md. 231, the Court approves the language of Lord Alvanley in *Milward* v. *Thanet*, 5 Vesey, 720, note b. "A party cannot call upon a Court of Equity for a specific performance unless he has shown himself ready, desirous, prompt and eager." In the case of *Penn* v. *McCullough*, *supra*, as in the present case, the defendant wrote the plaintiff a letter charging him with repeated failures to keep his promises and perform his contract, to which he made no reply. Commenting upon this, the Court said, "Now if he was ready

and anxious as he now says to perform his part of the contract, it is strange, to say the least, why he did not at once upon the receipt of this letter tender to the defendant the purchase money and demand a conveyance of the property.    So if the case rested here, we should have no hesitation in saying that the plaintiff had failed to perform his part of the contract." In the present case, the second letter of September 27th written after Johnson admits he was willing to waive the release he had previously insisted that he required, still more imperatively called upon him to tender the purchase money and demand a conveyance, yet he still remained silent.

Moreover "the circumstances outside of the contract itself" to which the Court in *Bamberger* v. *Johnson, supra,* has said, "regard will always be had," cannot be overlooked in this case.    Newman had been making every effort to sell this property for sometime, and for nearly six months had been vainly urging Johnson to perform the contract, and was being put off with one excuse or another.

When Flanigan appeared and proposed to purchase, prompt action was required of Newman, or he would have lost that opportunity to sell, and he could not be expected to wait indefinitely for the performance of promises repeatedly made and broken.    He did however give Johnson reasonable notice that unless the purchase money was paid he would consider the contract cancelled.    Flanigan assented to this, and neither took nor sought to take any advantage of Johnson in the matter.    Both he and Newman are shown to have acted throughout in good faith towards Johnson, who has only his inability or tardiness to blame for his situation.    Even if it were conceded that Johnson was in perfect good faith insisting upon his right to demand a release from the railroad, he should have elected either to accept the title without a release, or cancel the contract upon Newman's refusal to procure a release and enforce whatever rights, if any, he had under those conditions.    He could not play fast and loose with the contract, speculating upon the contingency of a resale, instead of complying with his own absolute obligation as to payment.

Flanigan proposed to consummate his purchase without a release from the railroad, and testified that on October 9th, Kelly told him he would not put up one dollar for Johnson until he would get a guaranteed title, and explained that he meant a title guaranteed by the Title Company to Hoffman under his application to them, and Kelly admitted this was true. Flanigan thus acquired in good faith valuable contract rights in this property after repeated defaults by Johnson; rights much more strongly invoking the favor of a Court of equity than any acquired by Johnson in view of all his conduct in the matter.

In such cases the Court will consider the claims of third parties who have dealt as to the property in good faith, and will not decree specific performance if injustice will thereby be done to them, or injury be inflicted upon the defendant.

For five months Johnson, according to his contention was declining to take such title as Newman had, and then when he finds Newman has a purchaser willing to take that title, asks the Court to award it to him,

In *Farber* v. *B. Coal Co.*, 216 Pa. St. 209, where the contract was for a fee simple estate, the vendor found he did not have the whole estate: He offered to convey the title he had, but the vendee refused to accept it, and afterwards asked for specific performance, which was refused, the Court saying, "it would not permit such inconsistent and unconscionable conduct on the part of a litigant, but on the contrary will compel him to act with due regard to the rights of other interested parties."

And in *Haxsell* v. *Renfrow*, 202 U. S. 294, the vendor offered to convey such title as he had, and the vendee refusing this, the vendor sold to another. The vendee afterwards asked specific performance, which was refused, the Court saying, "As the plaintiffs were unwilling to accept the deed unless a fuller and more undisputed possession were given than could be given at the time, Renfrow was justified in selling to another who would take the risk or rely upon his covenants."

Upon both the grounds above considered, and the authorities referred to, we think the law is settled adversely to the plaintiff; so without discussing any of the other matters argued in the briefs or at the hearing, we are of opinion under all the circumstances that there was error in granting the relief sought, and that the plaintiff should be left to his remedy at law, if any there be.

The decree of the Circuit Court No. 2 will therefore be reversed and the bill of complaint dismissed with costs to the appellant.

> *Decree reversed with costs and bill dismissed.*