ROBERTSON AND MILLS *v.* COAD, ᴇᴛ ᴜx.

[No. 53, September Term, 1967.]

*Decided March 8, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, McWILLIAMS and FINAN, JJ.

*M. Wayne Munday,* with whom were *Lee F. Holdmann, F.
DeSales Mudd* and *Mudd & Mudd* on the brief, for appellants.

*Edward S. Digges* and *Joseph S. Kaufman* for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The casus belli in this appeal stems from the phrase, "seller
to guarantee right of way to property," inserted in the contract
of sale at the behest of the buyers whose bill for specific per-
formance the chancellor dismissed. They charge error. We
agree.

The appellees (Coad) own a 171.5 acre tract of vacant land
in Charles County which lies more than a mile from the pub-
lic road. Access is achieved only by means of a narrow road
which may or may not be an easement appurtenant to the prop-
erty. It is conceded there is no mention of a right of way in
the chain of title. On 7 July 1961 Coad contracted to sell the
land to the appellants. The agreement of sale recites a pur-
chase price of $12,862.50 ($75 per acre), $3,730.12 of which was
to be paid in cash, the balance, $9,132.38, was to be secured
by a first trust. Settlement was required within 90 days and
until then the broker was to hold the initial deposit ($500).
Except for the "guarantee" the agreement was otherwise un-
remarkable. It was recorded among the land records of Charles
County on 1 November 1961.

Coad concluded it was incumbent upon him to obtain the sig-
natures of the owners of the properties lying between his land
and the public road to a written instrument establishing the

access road as a right of way. To this end he employed a surveyor to make a center line survey of the road. The survey was not completed until January 1963. During May and June of 1963 Coad obtained 7 of the necessary 15 signatures to an indenture he had caused to be prepared. Two of the signers, Locke Humbert and his wife, struck out their signatures two weeks after they had signed. For one reason or another Coad was unable to obtain any more signatures.

Either late in 1963 or early in 1964 Coad and the appellants met in Hyattsville and discussed Coad's lack of success in getting the indenture fully executed. Since Mr. Humbert was thought to be especially important in the scheme of things appellants volunteered to try to persuade him to reinstate his signature. Their efforts in that direction were equally unproductive.

In March 1964 Coad and the appellants had a second meeting. They agreed it was unlikely all the necessary signatures to the indenture could ever be obtained. Appellant Mills then asked Coad "what would * * * [he] think about * * * [appellants] taking it and just forget about the guarantee of the right of way * * * and would * * * [he] think about letting it go for $65 an acre instead of $75." According to appellants Coad said "he would think it over."

Coad's version of the conversation is as follows:

> "Q. What other discussion took place with reference to the property? A. Mr. Mills said that he couldn't possibly pay me seventy-five ($75.00) dollars an acre without the right-of-way. The best they could do and he turned to Mr. Robertson and they had a little discussion and he said, no and he said I will leave it up to Mr. Robertson and then Mr. Robertson then said sixty-five ($65.00) dollars an acre is the best we can offer you under these conditions and then we would want from thirty to sixty days for an additional— for a new contract."

Appellants categorically denied there was any mention of a new contract or a 30 or 60 day limitation.

Coad said he didn't give an answer "one way or another" because he "wanted to consult Mr. Digges [his attorney] first." On 13 March appellants were advised by their attorney that Coad would not sell for $65 per acre and that if they were not willing to settle "as per contract, or cancel [the] contract" he (Coad) intended to sue "to vacate [the] contract."

A month or so later there was an exchange of letters between counsel which we have set forth in full:

"April 21, 1964

"Edward S. Digges, Esquire
Attorney at Law
La Plata, Maryland
          "Re: Coad—Robertson and Mills Contract
"Dear Ed:

"Following our telephone conversation of last week with reference to the above matter, I telephoned Mr. Robertson the same day that the Sellers were willing to settle as per the terms of the contract provided the taxes and interest on the purchase money mortgage were adjusted to October 7, 1961. I have now been advised by the Purchasers that they do not feel that they are obligated under the circumstances to settle on this basis.

"I have in hand the check of the Purchasers for the $3230.12 balance of the cash payment as per the terms of the contract. The Purchasers are also ready and willing to deliver a good and sufficient purchase money mortgage for the * * * [$9132.38] balance of the purchase price, to bear interest from the date of settlement, that is the date of delivery of deed. The Purchasers further agree at the time of settlement to adjust taxes as of that date and to otherwise complete the settlement as per the terms of the contract of July 31, 1961, but will accept title without guarantee of a right of way to the property as provided in the contract.

"I have been directed by the Purchasers, and do hereby, tender settlement in conformity with provisions of the contract except that the guarantee by the

Sellers of a right of way to the property is waived and a copy of this letter is being forwarded to the Broker.

Sincerely yours,
F. DeSALES  MUDD"

"4  May  1964

"F. DeSales Mudd, Esq.
La Plata, Maryland
        "Re:   Coad—Robertson and Mills Contract
"Dear DeSales:

"With reference to your letter of April 21st concerning the above captioned contract, Mr. Coad was in my office on Friday and reviewed same. He advised that he can not settle in accordance with your letter as the delay in settlement was through no fault of his.

"Should your clients desire to complete settlement in accordance with my telephone conversation, which was to have interest on the purchase money mortgage run from October 7, 1961, as well as to adjust the taxes as of that date, Mr. Coad is agreeable to complete same. However, settlement must be concluded on or before Monday, May 18th, 1964.

"If your clients do not accept these terms as they have indicated, then I have been directed by Mr. Coad to return the deposit.

"I am also forwarding a copy of this letter to Chester Lyons, Real Estate Broker.

Cordially yours,
EDWARD  S.  DIGGES"

The broker earlier had tendered the return of the $500 deposit but appellants refused to accept it saying they "definitely * * * wanted the property." Coad declined to conclude the settlement in accordance with the terms of the contract. Appellants filed their bill for specific performance on 9 July 1964. Six times the sheriff made a return of "non est." Coad was served on 31 March 1966. He and his wife answered the bill of complaint on 18 April 1966.

The chancellor dismissed the bill at the conclusion of the trial on 27 December 1966. His principal reason for so doing, as set forth in an opinion filed shortly thereafter, was that appellants' actions at the second meeting "constituted a cancellation on their part of the original contract." As we said early on, we do not agree.

Coad's statement that the delay in settlement was "no fault of his" finds no support in this record. It will be recalled that the survey of the center line of the road was not completed until January 1963, 18 months after the execution of the contract. Four months elapsed before any signatures appeared on the "indenture." Another 6 or more months elapsed before they had the meeting at which Coad related to appellants his tribulations in the matter of obtaining the signatures. The efforts of appellants in this direction were fully expended in a matter of a month or so and their lack of success was reported to Coad and fully discussed with him at the March meeting. Since the whole thing came to a boil within the next 60 days it seems clear enough the appellants cannot be blamed for the delay.

We are unable to read into the evidence any intention on the part of appellants to terminate the contract at the March meeting. They said they merely asked Coad what he would "think about letting it go for $65 an acre instead of $75." Even if we accept Coad's version of what was said it is clear that he did not commit himself "one way or another." After he had consulted his attorney, however, he rejected the "offer," but, significantly, he took the position that unless appellants were willing to "settle as per *contract,* or cancel [the] *contract*" he intended to "institute proceeding[s] to vacate [the] *contract.*" (Emphasis supplied.) His choice of words is hardly consistent with a claim that the contract had been terminated.

Mr. Mudd's letter of 21 April suggests he had been having some telephone conversations with Mr. Digges concerning the contract, the parties and their differences. It is clear from Mr. Mudd's letter that Coad was trying to vary the terms of the contract in respect of the adjustment date for taxes and interest. Appellants would not agree to any such change, declaring themselves ready, willing and able to conclude the matter in accordance with the terms of the contract, except for the guarantee

of the right of way which they had a right to waive since it was for their benefit. *Scheffres v. Columbia Realty,* 244 Md. 270, 223 A. 2d 619 (1966); *Spruell v. Blythe,* 215 Md. 117, 120, 137 A. 2d 183 (1957); *Md. Fertilizing & Manuf. Co. v. Lorentz & Rittler,* 44 Md. 218 (1876). They proved they were able to settle by depositing the necessary funds with Mr. Mudd.

We see little difference between the instant case and *Chapman v. Thomas,* 211 Md. 102, 126 A. 2d 579 (1956) which, in our judgment, is controlling. There the contract, dated 21 June 1954, for the sale of 2 lots in a Montgomery County subdivision, called for settlement within 30 days or as soon thereafter "as a report on the title * * * [could] be secured if promptly ordered." The title search and a survey were ordered immediately by the buyer. Three weeks later the title company advised the buyer that the property had been sold for taxes and, at about the same time, the surveyor reported an encroachment by the adjoining property owner. The buyer went to the sellers and told them of the encroachment. They said they would straighten it out. They also promised him they would take care of the tax arrearage. A few days later the buyer was again assured that the encroachment would be cleared up. The buyer waited until 30 July and "having heard nothing from the sellers, [he] *went to their home to see if they would be willing to pay half the cost of an additional survey which was said to be necessary."* (Emphasis supplied.) He was told they were not going to do anything about the encroachment but that they were agreeable to the cancellation of the contract. The chancellor enforced the contract and we affirmed. Judge Hammond (now Chief Judge), for the Court, said:

> "We find the Chancellor to have been right in decreeing specific performance. While its granting or withholding lies in the sound discretion of the court, 'This discretion is not, however, arbitrary; and where the contract is, in its nature and circumstances, unobjectionable—or, as it is sometimes stated, fair, reasonable and certain in all its terms—it is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to award

damages for its breach.' *The Glendale Corp. v. Crawford*, 207 Md. 148, 154, and cases cited.

"The contract here answers the description of one justifying specific performance. The appellants' argument to the contrary, which we find untenable, is that Thomas did not show himself ready and eager to perform, and was in default for not settling within thirty days. Whether time is or is not of the essence in a contract for the sale of real estate, a purchaser who seeks specific performance has two primary obligations. First he must seek relief with due diligence and show that under all the circumstances he was 'ready, desirous, prompt, and eager', as an early English case, quoted with approval in *Doering v. Fields,* 187 Md. 484, 488, put it. See, too, *Raith v. Cohen,* 142 Md. 38, 50; *Soehnlein v. Pumphrey,* 183 Md. 334, 338. Second, if he delays settlement while attempting to have the seller remedy a claimed defect in the title of the property, he must, when it becomes clear the seller will not meet his demands, either accept the title as it is and promptly tender settlement, or cancel the contract. *Newman v. Johnson,* 108 Md. 367; *Vincenti v. Kammer,* 189 Md. 523, 531." *Id.* at 107-108.

It cannot seriously be contended that appellants failed to seek relief with due diligence and, having done so, that they did not show themselves to be "ready, desirous, prompt and eager" to complete the transaction. When Coad confessed his failure to obtain the necessary signatures to the indenture, appellants themselves volunteered to have a go at it. They made a number of attempts to talk to Mr. Humbert and on one occasion "waited all day" for him to keep an appointment. Their one try at getting a discount on the price per acre is certainly understandable but it can hardly be characterized as "playing fast and loose with the contract" as Coad contends, citing *Newman v. Johnson,* 108 Md. 367, 70 Atl. 116 (1908). As soon as Coad rejected their "offer" and insisted on either performance or cancellation they promptly elected to settle in accordance with the contract and forego the guaranteed right of way.

The chancellor did not cite in his opinion any authority for his holding that appellants' actions at the second meeting in March 1964 "constituted a cancellation on their part of the original contract," counsel have not directed our attention to any, nor have we found any. While we are unwilling to suggest that a situation could not arise where the efforts of a party to negotiate a change in one or more of the terms of a contract would effect the termination of the contract, we are wholly persuaded that the actions of these appellants did not terminate their contract with Coad. *Cf. L & L Corporation v. Ammendale,* 248 Md. 380, 236 A. 2d 734 (1968).

The chancellor's order dismissing the bill will be reversed and the case will be remanded for the passage of a decree specifically enforcing the contract of sale.

> *Order reversed.*
> *Case remanded for the passage of a decree conformable with the views expressed in this opinion.*
> *Costs to be paid by the appellees.*