# GROSS ET UX. *v.* J & L CAMPING & SPORTS CENTER, INC.

[No. 82, September Term, 1973.]

*Decided December 6, 1973.*

The cause was argued before MURPHY, C. J., and MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*W. Lee Harrison,* with whom was *Cooper C. Graham* on the brief, for appellants.

*Paul B. Lang,* with whom was *Forrest F. Bramble, Jr.,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

This suit was brought in the Circuit Court for Baltimore County (Proctor, J.) by the appellee, J & L Camping & Sports Center, Inc., against Mr. and Mrs. Charles R. Gross, appellants, seeking specific performance of a contract to sell their property located in Baltimore County which is designated in the agreement as 8560 and 8566 Pulaski Highway. Though admitting their execution of the land sales contract, the appellants, in an effort to defeat appellee's complaint, besides raising a procedural question, argue that the agreement was unconscionable and its procurement was tainted with fraud sufficient in magnitude to prevent specific performance. For the reasons which follow, we shall

affirm the decree of the chancellor "that the Agreement of Sale of December 16, 1971 between the parties . . . be, and hereby is, specifically enforced."

As the record in this case supports the full and complete factual findings of Judge Proctor, and as we cannot say he was clearly in error in making these findings (Maryland Rule 886), our synopsis of the evidence is substantially derived from the judge's factual determinations which were announced from the bench.

On July 19, 1966, Mr. and Mrs. Gross listed for sale at $100,000 their Pulaski Highway property with Aston Realty, a real estate concern owned by J. William Aston (the individual who appellants seemingly designate as the preeminent miscreant in the perpetration of a furtive scheme to filch their property). Aston agreed to list the property at that price, although he had previously examined it and advised the appellants that he estimated its worth to be somewhere between $65,000 and $75,000. The brokerage agreement, in addition to registering the property for sale, specified rental terms in the event that the agent procured a lease for, rather than a sale of, the tract. We mention here that the record shows that two tenants secured by this broker occupied the premises under short term leases before the appellee entered the picture and before the ensuance of the events which culminated in this appeal. However, details of these arrangements are irrelevant to our disposition of this case.

In spite of Aston's continuing efforts to obtain a more favorable sale or lease arrangement for the property, it was not until the late fall of 1968 that any real indication of success in this venture began to appear. It was at this time that the broker became acquainted with a representative of J & L while attending a sporting goods show in Laurel as a prospective purchaser of a recreation vehicle. The realtor was advised by one of the sporting goods company's owners that it was interested in finding new quarters for their business which was then situated in Rosedale, an area of Baltimore County located not more than a mile from the subject property. The broker offered to show J & L three of

his listings as possible spots for their relocation. Included among the three was the appellants' Pulaski Highway property; and upon inspection of that tract, J & L became sufficiently interested in it to propose an arrangement which included a lease of the premises with an option to purchase for $75,000. Aston forwarded this offer to the Grosses who, although definitely interested in the lease portion of the proposal, spurned the arrangement because of the inadequacy of the suggested purchase price. This rejection of the option was influenced, to at least some extent, by indications that the State eventually intended to acquire the property for additional highway service. When the appellee increased its offer to $85,000, payable in cash if the option were exercised, appellants requested Aston to get in touch with the State Roads Commission in an effort to ascertain if there existed any definite information as to when, if ever, the State planned to go through with the rumored acquisition.[1] As it turned out, however, the agent's inquiry proved to be fruitless.

It is at this point in the record that some conflict in the evidence appears. Though Mr. Gross testified that he protested the inclusion of the purchase option in the agreement and consented to it only after the broker assured him that it would never be exercised, Judge Proctor, principally relying on Mrs. Gross's testimony, made a determination that appellants "were interested in whether or not the option would be exercised; that Aston said [appellee] probably wouldn't have the money; and that [appellants] took a calculated risk . . . ." In any event, on February 22, 1969, the lease, including the $85,000 option to purchase, was executed by all of the parties with only minor changes, insignificant to the resolution of this dispute.

Nearly two years later, in the fall of 1971, when J & L informed Aston that they wished to exercise their option to purchase appellants' property, he conveyed this information

---

1. We point out that the Grosses were keenly aware of how condemnation proceedings operate because some fifteen years earlier adjoining segments of their property had been taken by the State to make way for a ramp leading to the Baltimore Beltway.

to the Grosses. The broker, following some negotiations concerning payment terms, drafted an agreement which provided for a $1,000 deposit and settlement to be made within 120 days with the balance of the purchase price payable by means of an additional $19,000 in cash and a $65,000 purchase money mortgage to be amortized over a fifteen year period together with interest at 8%. It is conceded that this arrangement in these particulars differed from the provisions in the option which called for full payment in cash.

When this sales agreement was submitted to Mr. and Mrs. Gross for execution, they say that they were hesitant to sign and did so reluctantly only when Aston threatened them with a law suit. Whether this threat was in fact made is of little consequence. This is so as the appellants obtained independent advice from their regular attorney that they need not sign the sales agreement (presumably because of the change in the payment provision from that contained in the option) and, disregarding this, proceeded to execute the contract anyway.

Be that as it may, the Grosses, after first obtaining a postponement, subsequently refused to convey the property.[2] Their continued refusal to do so has resulted in the institution of this specific performance action by J & L.

While the granting or withholding of a decree for specific performance lies within the discretion of the trial court, in the words of Chief Judge Brune, speaking for this Court in *The Glendale Corp. v. Crawford*, 207 Md. 148, 154, 114 A. 2d 33 (1955):

> "This discretion is not, however, arbitrary; and where the contract is, in its nature and circumstances, unobjectionable — or, as it is sometimes stated, fair, reasonable and certain in all its terms — it is as much a matter of course for a court of equity to decree specific performance of it

---

**2.** An interesting aside is that the Grosses were informed by letter on April 26, 1972 that the State did intend to acquire this property and offered to purchase it for $123,000.

> as it is for a court of law to award damages for its breach."

*Styers v. Dickey*, 261 Md. 225, 274 A. 2d 374 (1971); *Robertson v. Coad*, 249 Md. 252, 259, 239 A. 2d 75 (1968).

Appellants do not question that the contract here meets with the requirements for certainty; instead, they urge that the agreement is veiled in such unfairness and deceit as to prohibit it from being specifically enforced. In support of this contention, the Grosses point to the fact that the agent: (i) told them that there was no need for an attorney to prepare the lease-option agreement as he (the broker) could do so and thereby save them this expense; (ii) advised them that the lessee would never exercise its option to purchase; (iii) threatened to sue them if the deal was never consummated; and (iv) did not inform them, as he had the duty to do, that he was also acting in the interest of the appellee, particularly in his agreeing to lend J & L $5,000 to be applied to the purchase price. Furthermore, the appellants argue that since here these deceptions are coupled with a grossly inadequate purchase price, the result is an unconscionable agreement incapable of being specifically enforced.

We conclude that Judge Proctor was correct in finding that appellants have not met the burden they have of establishing that this contract, which is fair upon its face, was procured by fraud, *Berger v. Hi-Gear Tire & Auto*, 257 Md. 470, 475, 263 A. 2d 507 (1970); *Abrahams v. King*, 111 Md. 104, 111, 73 A. 694 (1909). Despite their attempt to weave the facts into a scheme of intrigue and deception, we agree with the trial judge that there is no evidence to support this and that:

> "It is inconceivable ... [that appellants] did not know that by signing the lease option agreement, they, in law and in fact, conferred upon [appellee] the right to purchase this property in accordance with the terms of the option. Gross is a college graduate; he operated two businesses, apparently with success, over a period of fifteen years; since

that time he has been teaching in the Baltimore County Public School system; he has participated in the leasing of these premises on three or four different occasions; he had an attorney handle similar matters for him in the past, and the same attorney was consulted on one phase of this transaction [in fact the critical phase, *i.e.,* the signing of the sales contract]. Mrs. Gross has a high school education plus business courses and is also familiar with leases, having also participated in prior leasing of these premises."

Having carefully examined all of appellants' arguments in light of the trial judge's factual determinations, it appears to us that the Grosses are doing little more than attempting to escape from what they now consider to be a bad bargain. But, as we have often held, a bad bargain alone is an insufficient basis for a court of equity to intervene and set aside a contract. *Blumenthal v. Heron,* 261 Md. 234, 274 A. 2d 636 (1971); *Taylor v. Turley,* 33 Md. 500 (1871). It seems clear to us that the decision of Mr. and Mrs. Gross to include the option to purchase in the rental agreement was the result of a balancing process in which they weighed the value of the benefits they would receive in granting the option against the chance that it would in fact be exercised by J & L. In doing so, their own testimony reveals that they were influenced to a considerable degree in signing the agreement by the higher rent which was obtainable by granting the option, as well as the advantage of designating a price which would be evidence of the value of their property in the event of a condemnation by the State. While they may have also considered a statement made by Aston to the effect that chances were dim that J & L would exercise the option, such a remark can be considered as little more than speculation and is certainly not in that class of propositions which we have held to be misrepresentations intentionally made to deceive. *See, e.g., Iula v. Grampa,* 257 Md. 370, 263 A. 2d 548 (1970). In addition, while Mr. and Mrs. Gross might have subjectively hoped that this option would never be exercised, when a writing is as clear and

unambiguous in expressing the intention of the parties as this one is conceded to be, absent some impediment extraneous to the words employed in the instrument, both parties are bound by it. *U.S.I.F. Triangle v. Rockwood Dev. Co.*, 261 Md. 379, 383-84, 275 A. 2d 487 (1971), and the cases cited therein.

Finally, simply because Aston agreed subsequent to the signing of the December 1971 sales contract to make a loan of $5,000 to the purchasers, in an effort to assist them in exercising that option, the broker cannot be held to have breached his quasi-fiduciary duty to the appellants. As we said in *Hardy v. Davis*, 223 Md. 229, 234, 164 A. 2d 281 (1960):

> "We see nothing in the case to vary the usual rule that the agency terminated when the purpose for which it was created was accomplished — when the sale was made and the contract evidencing it was signed. Thereafter, the broker no longer had any 'subsisting and continuing duty' . . . to disclose the making of the loans to the buyers to enable them to complete the purchase, since the loans did not hinder, delay or interfere with, but rather facilitated, the consummation of the sale."

On this subject, we need say no more.

Although the contract price of $85,000 established in 1969 is substantially less than $123,000 (the sum the State offered for the property when it finally proposed to acquire the tract in 1972),

> ". . . the fairness or hardship of a contract is to be determined as of the time when it is made, not on the basis of subsequent changes and conditions which may make it less beneficial to one party and more beneficial to the other than at the time it was entered into." *Pollin v. Perkins*, 223 Md. 532, 544, 165 A. 2d 908 (1960).

In addition, we note that Judge Proctor commented:

> "Knowing the substantial increase we have had in

value of real estate in Baltimore County over recent years, the court can well believe that the value of this property increased over a period of more than three years from $85,000 to $123,000."

Bearing all this in mind, the value established in 1969 was neither by itself nor when considered in light of the surrounding circumstances so inadequate as to prevent specific performance of this contract. *Manning v. Pot. El. Power Co.*, 230 Md. 415, 187 A. 2d 468 (1963).

In their final effort to parry defeat, appellants raise a procedural objection. They contend that they were improperly and prejudicially required to present their defense before the appellee, the complainant in the trial court, was first compelled to establish prima facie a case for specific performance. The Grosses reason that this anomaly resulted from an improper ruling by the trial judge that a prima facie case for the relief prayed had been presented when, at the instance of the appellee, the contract (concededly executed by all of the parties) and a letter from appellee's attorney to appellants were received as evidence. This letter, dated April 12, 1972, advised the Grosses that settlement would be held at 10:00 a.m. two days later, and further stated that at that time J & L "will be fully prepared to complete the sale of the property in accordance with the terms of the December 16, 1971, contract . . . ." The Grosses admit receiving this letter but rely on the decision of this Court in *DeCrette v. Bonaparte*, 139 Md. 252, 114 A. 880 (1921) (which holds that a plaintiff has the burden of demonstrating either that he had performed or was ready, willing and able to perform the contract), and argue that this letter alone falls far short of what is necessary in order to establish a prima facie case.

We think that there is a two tiered answer to this contention. First, appellants failed to test this alleged legal insufficiency in the evidence by a motion to dismiss as required by Maryland Rule 535.[3] By their failure to make

---

3. This rule provides:

"In any action tried by the court without a jury at law or in equity, any party, without waiving his right to offer evidence in

such a motion, any other type of objection based on this point made at trial prior to the commencement of appellants' case becomes a nugacity. Next, even if we agreed with the Grosses and were to conclude that the April 12th letter did not establish prima facie appellee's ability to settle in accordance with the contract, a point we need not decide, appellants' cause is not aided. This is true, because rather than resting at the conclusion of appellee's case, appellants elected to proceed by presenting evidence on their own behalf. In doing so they called James Gay, president of J & L, and, in accordance with Maryland Code (1957, 1971 Repl. Vol.), Art. 35, § 9,[4] cross-examined him as to, among other things, the corporation's ability to perform. Even if by so proceeding the objection was not withdrawn or otherwise waived, by selecting this tack, the defect complained of was cured, if one in fact existed, and any error, if there was one, rendered harmless when, in answer to interrogation by appellants' counsel, the company president responded "I showed up on April 14th, Mr. Aston had $11,000 [(the deposit)] in escrow,[5] and I had $4,000 in a certified check, plus a blank check for settlement expenses. The other $5,000 was coming from Mr. Aston. I had $5,000 and he was going to lend us $5,000 towards the $20,000." Though called by the Grosses as if he were an adverse party, appellants became bound by this portion of his testimony because it was neither contradicted nor impeached. *McCarty v. City of Baltimore*, 265 Md. 423, 428, 290 A. 2d 521 (1972); *Thomas v. Corso*, 265 Md. 84, 103, 288 A. 2d 379 (1972); *Nizer v. Phelps*,

---

the event the motion is not granted, may move at the close of the evidence offered by an opponent for a dismissal on the ground that upon the facts and the law he has shown no right to relief. Unless the court otherwise specifies such a dismissal operates as an adjudication upon the merits."

4. This section provides:

"In any suit, action or proceeding at law or in equity in any court of this State, any party may call as a witness any adverse party or any officer, director or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party."

5. Sometime just prior to April 14, J & L turned over $10,000 to Aston to be placed in an escrow account for settlement of the transaction along with the $1,000 deposit that was called for in the sales contract.

252 Md. 185, 203, 249 A. 2d 112 (1969). This evidence was sufficient to prove that J & L was able to perform its part of the contract. *Robertson v. Coad*, 249 Md. at 258.

We agree with Judge Proctor that the contract should be specifically enforced.

> *Decree affirmed.*
> *Costs to be paid by the appellants.*