282 Md. 588 (1978)
386 A.2d 1216
MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION ET AL.
v.
WASHINGTON NATIONAL ARENA
[No. 115, September Term, 1977.]
Court of Appeals of Maryland.
Decided May 23, 1978.
*590 The cause was argued before MURPHY, C.J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.
Sanford E. Wool, with whom was D.S. Sastri on the brief, for appellant Maryland-National Capital Park and Planning Commission. James C. Chapin, County Attorney, and John R. Gober, Associate County Attorney, with whom was Michael O. Connaughton, Deputy County Attorney, on the brief, for appellant Prince George's County, Maryland.
Amicus curiae brief filed by Supervisor of Assessments for Prince George's County, Francis B. Burch, Attorney General, and Robert J. Aumiller, Assistant Attorney General, on the brief.
Peter F. O'Malley, with whom were Glenn T. Harrell, Jr., and O'Malley, Miles, Farrington & McCarthy on the brief, for appellee.
*591 LEVINE, J., delivered the opinion of the Court.
The central issue in this appeal is whether a lessee may, consistent with the public policy of this state, voluntarily agree to relinquish in advance his statutory right to challenge a determination by the Supervisor of Assessments that the demised premises is subject to real property taxation. The Circuit Court for Prince George's County struck down such a noncontestability covenant in a lease between appellant, Maryland-National Capital Park and Planning Commission (the Commission), and appellee, Washington National Arena Limited Partnership (the Arena). On appeal the Court of Special Appeals declined to reach the merits, holding instead that the chancellor should have refused to assume jurisdiction to award declaratory relief under the Uniform Declaratory Judgments Act. Md.-Nat'l C.P. & P. Com. v. Wash. Nat'l Arena, 37 Md. App. 346, 360-61, 377 A.2d 545 (1977). We granted certiorari to review the decisions of both courts, and for reasons that follow we now reverse.
On August 11, 1971, an agreement was executed pursuant to which the Commission leased to Potomac Sports, Ltd., the Arena's predecessor in interest, a tract of land comprised of some 50 acres located at Largo in Prince George's County. The lease provided further for the construction of a major public athletic and recreational complex having a seating capacity of approximately 18,000 persons.
Under paragraphs 6(a) and 6(b) of the agreement, the lessee covenanted to pay as "additional rent" to state and local tax collecting authorities all property taxes on real estate improvements. Clause one of paragraph 6(c) conferred upon the lessee the "unrestricted right" to contest through administrative and judicial channels the amount of any assessment or valuation and to pay under protest any billing of such real property taxes or assessments. The right of the lessee, however, to challenge a determination of the taxability of the improvements was abrogated by the second clause of paragraph 6(c) around which the present dispute is centered and which, in its entirety, provided:
"Lessee further agrees that it will not contest or challenge any determination by the State assessor *592 [sic] that the real estate improvements are subject to real estate taxes; however, in the event that said real estate improvements are determined by the State assessor [sic] not to be subject to real estate taxes, the Lessee agrees to pay to the Lessor an additional annual rental over and above that provided in Paragraph 5 of this Lease Agreement in the sum of $325,000.00." (emphasis added).
As consideration for the assignment by Potomac Sports of all its "right, title, interest and estate" in and to the Lease Agreement, the Arena, with the Commission's approval, agreed on August 1, 1972, to assume "each and all obligations of Potomac as Lessee under the Lease," including the restrictions imposed by the noncontestability clause just quoted. Three weeks later the Commission and the Arena executed an addendum to the original contract providing for the lease of an additional 10-acre parcel for use as a parking facility. Construction of the complex commenced on August 24, 1972, and within the short span of 16 months the "Capital Centre," as the facility has since come to be called, opened to the public for the first time.
Early in January 1974 the Commission received notification from the Supervisor of Assessments for Prince George's County that the 60-acre tract on which the Capital Centre had been erected was to be assessed for purposes of property taxation at a value of $1,980,000. Soon thereafter a similar notice followed, informing the parties that a decision had been made to assess the structural improvements at $11,650,000. Contending that both the land and improvements were tax-exempt under Maryland Code (1957, 1970 Repl. Vol., 1977 Cum. Supp.) Art. 66D, § 5-109 (a) and Code (1957, 1975 Repl. Vol., 1977 Cum. Supp.) Art. 81, § 8 (7) (e),[1] the Arena filed formal protests with the Supervisor. These efforts proved *593 fruitless, however, and in November 1974 the assessments became final.
Disregarding the explicit prohibition of paragraph 6(c), the Arena appealed the Supervisor's decision respecting the taxability of the improvements to the Property Tax Assessment Appeal Board for Prince George's County.[2] Within days of the scheduled hearing before the Appeal Board, the Commission instituted this action for declaratory and injunctive relief in the Circuit Court for Prince George's County, seeking to block the Arena from pursuing its administrative appeal in violation of the noncontestability clause of the 1971 lease. An attempt was made by appellant Prince George's County and the State of Maryland to intervene in the Commission's suit; however, only the County was given permission to do so.
The Arena interposed several defenses to the bill of complaint, arguing (1) that the noncontestability term was both void as against public policy and contrary to the due process clauses of the Federal and State Constitutions; (2) that specific performance of paragraph 6(c) was improper due to ambiguities in the contract language; and (3) that injunctive relief was inappropriate because the Commission had not sustained irreparable harm as a consequence of the breach.
After hearing oral argument and reviewing legal memoranda, the chancellor issued a decree on May 8, 1975, declaring the contractual waiver of appellee's right to protest the taxability of the leasehold improvements null and void as repugnant to public policy. No ruling was made on the Arena's remaining defenses.[3] Holding that the circuit court had erred in denying the State's earlier motion to intervene, the Court of Special Appeals in Md.-Nat'l Cap. P. & P. v. *594 Wash. Nat'l Arena, 30 Md. App. 712, 354 A.2d 459 (1976), reversed the order of the chancellor and remanded for a new hearing on the Commission's complaint. With the State participating, a second hearing was held and in a memorandum opinion dated November 10, 1976, the chancellor reaffirmed his prior order invalidating the noncontestability clause.
Subsequently, the Commission, joined by the two governmental intervenors, noted an appeal to the Court of Special Appeals, which, for reasons to be discussed below, vacated the chancellor's order and dismissed the bill of complaint. 37 Md. App. at 362. Only the Commission and Prince George's County sought further review in this Court.

I
Raising the issue on its own initiative, and thus without the benefit of any presentation by the parties, the Court of Special Appeals concluded that the chancellor abused his discretion in accepting and retaining jurisdiction over the Commission's action for declaratory and injunctive relief. In the court's view, the availability of an administrative remedy in the Maryland Tax Court and the Property Tax Assessment Appeal Board precluded the circuit court from issuing a declaratory decree under the Uniform Declaratory Judgments Act, Code (1974), §§ 3-401 et seq. of the Courts and Judicial Proceedings Article. We disagree.
At the outset we observe that the "jurisdictional" objection posed by the Court of Special Appeals actually envelops two closely-akin but nevertheless distinct questions. The first of these relates to the power of the chancellor under the Uniform Declaratory Judgments Act to award declaratory relief where an alternative administrative remedy exists. If, as as we shall hold, the circuit court did have authority to issue its declaratory decree, the issue then presented is whether, as a matter of judicial policy, not power, the chancellor should have refrained from exercising jurisdiction to construe the disputed noncontestability provision and awaited the outcome of the administrative appeal. See Gannon v. Perk, 46 Ohio St.2d 301, 348 N.E.2d 342, 348 (1976).
*595 Notwithstanding the strong legislative policy favoring the liberal use and interpretation of the Declaratory Judgments Act to effectuate its broad remedial objectives, as expressed in § 3-402 of the Courts and Judicial Proceedings Article, see Millett v. Hoisting Engineers' Licensing Div., R.I., 377 A.2d 229, 233 (1977), declaratory relief is barred wherever the parties have resort to a special statutory procedure to resolve their differences:
"If a statute provides a special form of remedy for a specific type of case, that statutory remedy shall be followed in lieu of a proceeding under this subtitle." § 3-409 (b) of the Courts and Judicial Proceedings Article.[4]
Thus, with certain notable exceptions not relevant here, we have repeatedly held that where a specific statutory remedy is available, it is mandatory for the court to dismiss the suit for declaratory judgment and remit the plaintiff to the alternative forum. Tanner v. McKeldin, 202 Md. 569, 577, 97 A.2d 449 (1953); accord, Soley v. St. Comm'n on Human Rel., 277 Md. 521, 526, 356 A.2d 254 (1976); Lawrence N. Brandt, Inc. v. Mont. County, 39 Md. App. 147, 155, 383 A.2d 688 (1978).
As our case law amply demonstrates, however, the prohibition against awarding declaratory relief to parties who have alternative statutory or administrative remedies is applicable only where the alternative means of redress was intended to be exclusive. DuBois v. City of College Park, 280 Md. 525, 533, 375 A.2d 1098 (1977); see E. Borchard, Declaratory Judgments 342 (2d ed. 1941). This interpretation of § 3-409 (b) is borne out by the language of § 3-409 (c) of *596 the Courts and Judicial Proceedings Article, which specifically provides that:
"A party may obtain a declaratory judgment or decree notwithstanding a concurrent common-law, equitable, or extraordinary legal remedy, whether or not recognized by statute." (emphasis added).
In light of the broad remedial objectives of the Declaratory Judgments Act, § 3-409 (b) will be invoked to deprive a trial court of power to render a declaratory decree only in those cases where the Legislature intended to prohibit the exercise of concurrent jurisdiction by the courts. The immediate question before us, then, is whether the Legislature would have intended to endow the tax appeal tribunals with authority, to the exclusion of courts of ordinary jurisdiction, to determine the validity of the noncontestability clause of paragraph 6(c) of the 1971 Lease Agreement. Considering the narrowly defined statutory function of the Maryland Tax Court and local property tax appeal boards, we cannot say that the Legislature would have intended to oust the chancellor of his jurisdiction to hear the Commission's claim for declaratory relief.
Each property tax assessment appeal board has authority to hear all appeals in a given county concerning property tax assessments. Code (1957, 1975 Repl. Vol., 1977 Cum. Supp.) Art. 81, § 250. The subject matter jurisdiction of the local property tax assessment appeal boards is set out in Art. 81, § 255 (b) (1), which provides that a taxpayer may demand a hearing before the property tax assessment appeal board as to the "assessment of any property ... or as to the increase, reduction or abatement of, or refusal to increase, reduce or abate, any such assessment, or as to the classification thereof, made by the initial assessing authority," which in this case was the Supervisor of Assessments for Prince George's County.
The authority of the Maryland Tax Court is delineated in Art. 81, § 256 (a). Enumerated persons aggrieved by a decision of a property tax assessment appeal board or other final assessing authority may petition the Tax Court for *597 further review regarding any "assessment or classification" or "any increase, reduction, abatement, modification, change or alteration" of any assessment or classification or the failure to do any of the foregoing acts. Although not in and of itself a grant of subject matter jurisdiction, see Mont. Co. Council v. Supervisor, 275 Md. 339, 347-48, 340 A.2d 302 (1975), Art. 41, § 318 (1) states that the Tax Court shall have jurisdiction to hear appeals "with respect to the valuation, assessment, or classification of property, or the levy of a tax, or with respect to the application for an abatement or reduction of any assessment, or tax, or exemption therefrom." Article 81, § 229 (f) provides that the Tax Court "shall have full power to hear, try and determine or remand any matter before it." The court is empowered to dispose of matters, over which it has jurisdiction by reassessing, reclassifying or modifying any valuation, assessment, classification, tax or final order from which an appeal has been taken. Art. 81, § 229 (h). Finally, parties to proceedings before the Tax Court are permitted to submit requests for rulings on points of law "similar to prayers in nonjury cases in courts of law." So far as any such request is material to its decision, the court must then grant, reject or modify it. Art. 81, § 229 (k).
When read together, the foregoing statutory provisions manifest a clear legislative intent to limit the jurisdiction of the tax agencies primarily to the review of decisions concerning the assessment, valuation and classification of real and personal property for tax purposes. Presumably, in enacting such an intricate and comprehensive mechanism for the review of property tax determinations, the General Assembly sought to afford the taxpaying public a systematic and efficient method of fact-finding and policy-formation in an area where many of the day-to-day problems of administration either lie beyond the conventional competence of the courts because of the technical complexity of the subject matter or, because of their routine nature, are not properly suited for resolution in formal adjudicatory proceedings. See Sawejka v. Morgan, 56 Wis.2d 70, 201 N.W.2d 528, 533 (1972).
*598 Thus, with rare exception, we have insisted that taxpayers pursue their statutory remedies under Article 81 whenever they attempt to challenge a decision as to the amount of an assessment, the valuation of property, or the applicability of the tax statutes to a particular parcel of land or to improvements thereon. See State Dep't of A. & Tax. v. Clark, 281 Md. 385, 404, 380 A.2d 28 (1977). The overriding public interest in the speedy and orderly collection of revenues demands that there be finality upon failure of an aggrieved party to exercise the statutory right of appeal from allegedly illegal or erroneous tax assessments and that collateral attack by way of a declaratory judgment suit be prohibited. Reiling v. Comptroller, 201 Md. 384, 388-89, 94 A.2d 261 (1953); Tawes, Comptroller v. Williams, 179 Md. 224, 228-29, 17 A.2d 137, 132 A.L.R. 1105 (1941); see Palmer v. Perkins, 119 Colo. 533, 205 P.2d 785, 787 (1949).
Properly speaking, the matter of the enforceability of the waiver provision of paragraph 6(c) was not a problem arising under the tax statutes. It was, rather, purely and simply a question of contract construction. In resolving this dispute a court would not need to make any factual determinations as to the value of the real estate, nor would an inquiry into the proper application or interpretation of the revenue laws be necessary. See Verkouteren v. Sup'r of Assess., 38 Md. App. 216, 222, 380 A.2d 642 (1977). The claim presented by the Commission's bill of complaint was only tangentially related to the substantive tax law question of taxability, and thus did not fall squarely within the exclusive jurisdiction of the tax agencies.
On the other hand, the validity of the noncontestability provision was relevant to the question of the Arena's standing to institute an administrative appeal in the first instance. To this extent, then, the tax tribunals would have had incidental or implied power to determine the validity of the clause insofar as it pertained to the right of a party before them to maintain the protest. See R. Parker, Administrative Law 127 (1952); and see Cammarata v. Essex County Park Comm'n, 26 N.J. 404, 140 A.2d 397, 401 (1958). But the fact that an agency may be empowered to decide a legal question that is *599 encompassed by its incidental jurisdiction does not, absent a contrary indication from the Legislature, necessarily deprive the courts of all authority to adjudicate a point of law they could otherwise decide. And certainly no one would doubt the power of the courts of general jurisdiction in this state to construe, interpret and enforce provisions of contracts, leases, and other written instruments.
Support for the views expressed here may be found in Cambridge v. Eastern Shore Pub. Serv. Co., 192 Md. 333, 64 A.2d 151 (1949). There a conflict arose between the City of Cambridge and a local utility company as to whether a statute empowering the municipality to construct and operate its own electrical generating system superseded the utility's preexisting exclusive franchise to sell and distribute electrical power in Cambridge. The city commenced a declaratory judgment action contesting the validity of the utility franchise. The trial court sustained demurrers to the bill of complaint without leave to amend. On appeal the utility urged affirmance on the ground that the Legislature had specifically designated the Public Service Commission as the proper forum for settling disputes over utility franchises and had thereby preempted the power of the circuit courts to award relief under the Declaratory Judgments Act.
Concluding that the trial court did have jurisdiction to issue a declaration as to the validity and scope of the competing franchises, this Court acknowledged that the Public Service Commission, by reason of its statutory authority to issue certificates permitting utility operation in various localities throughout the state, possessed the incidental or implied power to determine the nature and validity of existing franchises. Nevertheless, we noted that the question of franchise validity was one of law and therefore subject in any event to full review by the courts. In view of the Public Service Commission's inability to render a binding judgment with regard to the franchise issue, we held that:
"[T]he existence of a right to complain to the Commission is not such a statutory remedy as to preclude the determination of the legal question in *600 a proceeding for declaratory relief. The enforcement of such a right seems to fall in the category of `an equitable remedy, or an extraordinary legal remedy .. . recognized or regulated by statute,' rather than `a special form of remedy for a specific type of case,' within the meaning of [§ 3-409 (b) of the Courts Article]." 192 Md. at 340-41.
The incidental power of the Public Service Commission to decide the validity of utility franchises was therefore not so exclusive as to prevent adjudication of this same question in a suit for declaratory judgment.
In the present case the question of the validity of the noncontestability clause, like the franchise issue in Cambridge, is essentially a judicial and not an administrative matter, and therefore fully reviewable by courts of law. Furthermore, deciding the legal question of contract construction in advance of the administrative question of taxability may well have disposed of the whole issue, and thus, by barring the Arena from mounting its appeal, may have prevented the delay and expense incident to a determination by the administrative tribunals. Cf. Pressman v. State Tax Commission, 204 Md. 78, 83, 102 A.2d 821 (1954) (administrative remedies may be by-passed where there is clear necessity for a prior judicial decision).
In sum, then, our own examination of the property tax appeal procedures of Article 81 and the limited subject matter jurisdiction of the appeal tribunals convinces us that the Legislature did not intend to confer upon these agencies exclusive power to construe contractual provisions such as the noncontestability clause of paragraph 6(c). Whatever authority the Tax Court and property tax assessment appeal boards possessed in regard to this purely legal question was merely incidental to their power to review the assessment, classification and valuation of real estate for tax purposes. As such, it was shared concurrently with the courts of ordinary jurisdiction. Since the alternative statutory remedy available to the Commission was nonexclusive, we hold that the chancellor had power under the Declaratory Judgments *601 Act to issue a declaratory decree determining the validity of paragraph 6(c).
It remains to be decided whether considerations of judicial policy required the chancellor to refrain from exercising his power to grant declaratory relief in deference to the administrative tax appeal agencies which had incidental jurisdiction over the matter of the enforceability of paragraph 6(c).
In our opinion the present issue is governed by the doctrine of primary jurisdiction, which is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies. Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); United States v. Western Pac. R. Co., 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); see generally Botein, Primary Jurisdiction: The Need for Better Court/Agency Interaction, 29 Rutg. L. Rev. 867 (1976).[5] The doctrine is not concerned with subject matter jurisdiction or the competence of a court to adjudicate, but rather is predicated upon policies of judicial restraint: "which portion of the dispute-settling apparatus  the courts or the agencies  should, in the interests of judicial administration, first take the jurisdiction that both the agency and the court have." Browne v. Milwaukee Bd. of Sch. Directors, 69 Wis.2d 169, 230 N.W.2d 704, 707 (1975); 2 F. Cooper, State Administrative Law 564-65 (1965); 3 K. Davis, Administrative Law Treatise § 19.01, at 3 (1958). It comes into play when a court and agency have concurrent jurisdiction over the same matter, Mordhorst v. Egert, 88 S.D. 527, 223 N.W.2d 501, 504 (1974), and there is no statutory provision to coordinate the work of the court with that of the agency. Mercury Motor Express, Inc. v. Brinke, 475 F.2d 1086, 1091-92 (5th Cir.1973); accord, Home Federal S. & L. Ass'n v. Insurance Dept. of Iowa, 428 F. Supp. 992, 996 (N.D. Iowa 1977).
*602 Primary jurisdiction is thus not a principle that governs judicial review of administrative action and in this regard is distinguishable from the doctrine requiring the exhaustion of administrative remedies.[6] The latter doctrine demands that a party fully pursue administrative procedures before obtaining limited judicial review and contemplates a situation in which the claim asserted is enforceable initially by administrative action exclusively. Mazzola v. Southern New England Telephone Co., 169 Conn. 344, 363 A.2d 170, 174 (1975). See also Eastern Shore Nat. Gas Co. v. Stauffer Chemical Co., 298 A.2d 322, 325 (Del. 1972). As we stated in Berwyn Heights v. Rogers, 228 Md. 271, 275, 179 A.2d 712 (1962):
"Where administrative remedies are not exclusive but merely cumulative to or concurrent with a judicial remedy, the rule that administrative remedies must be exhausted before resort is had to the courts does not come into play."
In contrast, primary jurisdiction is relevant only if the claim is enforceable by original judicial action, that is, where the claim is initially cognizable in the courts but raises issues or relates to subject matter falling within the special expertise of an administrative agency. United States v. Western Pac. R. Co., supra, 352 U.S. at 63-64; Writers Guild of America, West., Inc. v. F.C.C., 423 F. Supp. 1064, 1089-90 (C.D. Cal. 1976); Jaffe, Primary Jurisdiction Reconsidered: The Antitrust Laws, 102 U. Pa. L. Rev. 577, 579 (1954). In the present case, as we have previously concluded, jurisdiction to evaluate the validity of the noncontestability clause in paragraph 6(c) was shared between the chancellor and the tax appeal tribunals. As the claim was therefore cognizable in the trial court as an original matter, the principles of primary jurisdiction, not exhaustion, determine whether the chancellor abused his discretion in awarding declaratory relief, notwithstanding his power to do so.
Applying these principles to the case at hand, we conclude *603 that the chancellor acted properly in retaining jurisdiction to adjudicate the Commission's claim for declaratory and injunctive relief. In the first place, the interpretation and construction of a lease or other written instrument is a preeminently judicial function, one that is well within the conventional experience of the judiciary. See Far East Conf. v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952); Gt. No. Ry. v. Merchants Elev. Co., 259 U.S. 285, 291-92, 42 S.Ct. 477, 66 L.Ed. 943 (1922).
Secondly, application of principles of public policy and doctrines of constitutional law to measure the validity of a contractual provision like the one before us does not require the kind of special expertise and technical knowledge normally employed in administrative fact-finding and rule-making. See Nader v. Allegheny Airlines, Inc., supra, 426 U.S. at 304; MCI Communications Corp. v. American Telephone & Tel. Co., 496 F.2d 214, 222 (3d Cir.1974). For this reason it seems quite unlikely that a prior determination by the Tax Court would have provided any material assistance to the court in passing on a purely legal question. See Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 302, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); Fraternal Order of Po., Strawberry L. #40 v. Entrekin, 294 Ala. 201, 314 So.2d 663, 671 (1975). On the contrary, this was a case where a prior judicial decision would have been preferable. To be sure, whether or not the Arena's leasehold improvements are exempt from property taxation does involve questions of tax policy. But this was not the issue before the chancellor, nor is it the question before us here. The question before us deals strictly with the standing of the Arena to mount an administrative appeal and the effect of its voluntary agreement to waive the right to seek further review. Whatever connection this problem may have with the revenue laws, it is at best remote.
Thirdly, inasmuch as the Tax Court and property tax assessment appeal boards perform a primarily adjudicatory and hence non-regulatory function, the usual concern of courts for protecting the uniformity and integrity of the regulatory scheme is not pertinent here. See Texas & Pac. Ry. *604 v. Abilene Cotton Oil Co., 204 U.S. 426, 440, 27 S.Ct. 350, 51 L.Ed. 553 (1907). Even so, uniformity in interpreting and applying the tax statutes is an admirable goal. As pointed out above, however, the resolution of the merits of this appeal involves no interpretation of the revenue laws. Hence the uniformity rationale for deferring to the initial decision of the agency must be rejected as well.
Because neither the property tax appeal board nor the Tax Court manifestly could have rendered a binding judgment in respect of the contract construction claim, it would have been pointless for the Commission to have sought intervention in the Arena's administrative appeal. Similarly it would have served no useful purpose for the chancellor to have postponed consideration of the Commission's claim in deference to the ongoing administrative proceeding. Here, in theory at least, the benefits of a fair and expeditious resolution of the dispute over the validity of paragraph 6(c) by a court competent to render a final and binding judgment clearly outweighed the rather miniscule advantages of seeking preliminary administrative "assistance." See Miss. Power & Light Co. v. United Gas Pipe Line, 532 F.2d 412, 419 (5th Cir.1976), cert. denied, 429 U.S. 1094 (1977).
Accordingly, we do not agree with the Court of Special Appeals that the circuit court abused its discretion in reaching the merits of the Commission's complaint. Indeed, the retention of jurisdiction to award declaratory relief was the only sensible course for the chancellor to follow. Consequently, we hold that the circuit court acted properly in assuming and retaining jurisdiction to award declaratory relief.

II
In striking down the noncontestability clause of paragraph 6(c), the chancellor expressed the view that a voluntary agreement under which a taxpayer attempts to relinquish his statutory right to appeal from an adverse ruling of the Supervisor of Assessments is "inimical to our system of justice," and hence, unenforceable as a matter of public policy. For reasons which we shall shortly enumerate, we *605 think that the chancellor's reliance upon public policy principles to invalidate the disputed waiver provision was mistaken.
From the dawn of the common law tradition in England, courts have refused to implement those private contractual undertakings which, when measured against the prevailing mores and moods of society, contravene judicial perceptions of so-called "public policy." See 1 E. Coke, Institutes of the Laws of England: A Commentary upon Littleton *19 (Thomas ed. 1827) ("nihil quod est inconveniens est licitum"); Winfield, Public Policy in the English Common Law, 42 Harv. L. Rev. 76, 79 et seq. (1928).[7] This Court stated early on that considerations of public policy are deemed paramount to private rights and where conflict between the two exists, private interests must yield to the public good. Wildey v. Collier, 7 Md. 273, 278-79, 61 Am. Dec. 346 (1854).
Nearly 150 years ago Lord Truro set forth what has become the classical formulation of the public policy doctrine  that to which we adhere in Maryland:
"Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law." Egerton v. Earl Brownlow, 4 H.L. Cas. 1, 196 (1853).
Accord, Baltimore v. Md. Casualty Co., 171 Md. 667, 673, 190 A. 250, 111 A.L.R. 305 (1937); Md. Trust Co. v. Mechanics Bank, 102 Md. 608, 632, 63 A. 70 (1906); Casualty Ins. Company's Case, 82 Md. 535, 574, 34 A. 778, 38 L.R.A. 97 (1896). But beyond this relatively indeterminate description of the doctrine, jurists to this day have been unable to fashion a truly workable definition of public policy. Not being restricted to the conventional sources of positive law *606 (constitutions, statutes and judicial decisions), judges are frequently called upon to discern the dictates of sound social policy and human welfare based on nothing more than their own personal experience and intellectual capacity. See 6A A. Corbin, Contracts § 1375, at 10 and 18 (1962). Inevitably, conceptions of public policy tend to ebb and flow with the tides of public opinion, making it difficult for courts to apply the principle with any degree of certainty. 1 W. Story, A Treatise on the Law of Contracts § 675 (5th ed. 1874).
"[P]ublic policy ... is but a shifting and variable notion appealed to only when no other argument is available, and which, if relied upon today, may be utterly repudiated tomorrow." Kenneweg v. Allegany County, 102 Md. 119, 125, 62 A. 249 (1905).
Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where "the common sense of the entire community would ... pronounce it" invalid. Estate of Woods, Weeks & Co., 52 Md. 520, 536 (1879); Trupp v. Wolff, 24 Md. App. 588, 616, 335 A.2d 171, cert. denied, 275 Md. 757 (1975); see Aged Men's Home v. Pierce, 100 Md. 520, 526, 60 A. 277, 70 L.R.A. 485 (1905). This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle. Restatement (Second) of Contracts, Introductory Note to Ch. 14, at 46 (Tent. Draft No. 12, 1977); see Baltimore & Ohio etc. Railway v. Voigt, 176 U.S. 498, 505-06, 20 S.Ct. 385, 44 L.Ed. 560 (1900); Miller v. Continental Ins. Co., 40 N.Y.2d 675, 389 N.Y.S.2d 565, 358 N.E.2d 258, 261 (1976); Printing & Numerical Reg. Co. v. Sampson, L.R. 19 Eq. 462, 465 (Ch. 1875).
*607 In the final analysis, it is the function of a court to balance the public and private interests in securing enforcement of the disputed promise against those policies which would be advanced were the contractual term held invalid. Enforcement will be denied only where the factors that argue against implementing the particular provision clearly and unequivocally outweigh "the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement" of the contested term. Restatement (Second) of Contracts § 320, Comment b (Tent. Draft No. 12, 1977).[8]
Armed with these fundamentals, we consider now the Arena's public policy contentions in the present appeal. It is first argued that enforcement of the noncontestability clause would thwart the purpose of the General Assembly in establishing the elaborate administrative procedures for the review of property tax assessments contained in Article 81, §§ 229 and 255-56. The Arena suggests that the legislative intent was to safeguard taxpayers from arbitrary and capricious administrative action by guaranteeing them a right of appeal. Assuming appellee's appraisal of the legislative purpose is accurate, we see no conflict between this policy and the waiver provisions of paragraph 6(c). First of all, there is nothing in Article 81 which can be interpreted to prohibit expressly or impliedly a voluntary waiver of the right to appeal taxability determinations. See Spruell v. Blythe, 215 Md. 117, 137 A.2d 183 (1957) (statutory rights under Land Installment Sales Act could not be waived by purchaser where Act explicitly provided that failure to abide by its terms rendered contract voidable at option of purchaser); see also *608 Brooklyn Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).
To the contrary, the decision to appeal under Article 81 is purely discretionary with the taxpayer. See, e.g., Article 81, § 255 (b) (1) ("any taxpayer ... may demand a further hearing before the property tax assessment appeal board....") (emphasis added). Furthermore, a determination by the Supervisor of Assessments will become final and binding if the taxpayer merely acquiesces in the administrative decision and fails to assert his right of review within the stipulated time for appeal. Unless the tax appeal bodies grant him discretionary review under Article 81, § 67, the taxpayer who neglects to file a timely notice of appeal forfeits all right to administrative and judicial review, except in rare instances. See State Dep't of A. & Tax. v. Clark, supra, 281 Md. at 404-405. It follows, therefore, that if a taxpayer may voluntarily relinquish his right to appeal simply by allowing the statutory time period to expire, he may accomplish the same result by executing in advance an agreement waiving his right of review without running afoul of the legislative policies underlying Article 81, § 255 and related sections.
The Arena next argues that to implement paragraph 6(c) would be to "seriously challenge the jurisdiction of the courts in Maryland" by effectively insulating administrative determinations from judicial review. Preliminarily, we posit the self-evident proposition that individuals cannot by private compact abridge or enlarge the power of a court to review an administrative determination which it is otherwise competent to adjudicate. See General Dynamics Corp. v. United States, 558 F.2d 985, 990 (Ct. Cl. 1977); Smith, Valentino & Smith, Inc. v. Superior Ct. of L.A. Cty., 17 Cal.3d 491, 131 Cal. Rptr. 374, 551 P.2d 1206, 1208-09 (1976); and see In re Glen Rock, 25 N.J. 241, 135 A.2d 506, 511 (1957). That power is derived exclusively from the Constitution and statutes of this state. Thus, when presented with a provision like paragraph 6(c), purporting to limit the prerogative of the contracting parties to obtain judicial review of controversies arising under the agreement, the only question properly before the court is whether it should elect to exercise its *609 jurisdiction in a manner other than to effectuate the legitimate expectations of the parties. The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). Consequently, the fact that a waiver provision is valid in respect of the public policy of the forum does not preclude a court from refusing to enforce it, if it finds, for example, that to do so would perpetrate a fraud upon the party against whom enforcement is sought.
Appellee would argue, however, that public policy forbids a court from ever giving effect to an agreement which purports to deprive a party of his right to appeal from an adverse administrative determination. That is to say, contracts, such as paragraph 6(c) in the present case, waiving the right to seek judicial review, are ipso facto void on their face and may not be enforced by a court even as a matter of discretion.
At common law, agreements providing for the settlement of future legal disputes by means other than through conventional judicial proceedings were considered bargains obstructing the administration of justice and were consequently deemed unenforceable at law or in equity. E.g., Insurance Company v. Morse, 87 U.S. (20 Wall.) 445, 451, 22 L.Ed. 365 (1874); Stephenson v. Piscataqua F. & M. Ins. Co., 54 Me. 55, 70 (1866); Scott v. Avery, 5 H.L. Cas. 811, 853 (1856); Kill v. Hollister, 1 Wils. 129 (1746). This doctrine was later invoked to nullify provisions in contracts purporting to cut off, in advance of any actual controversy, the right of a party to prosecute an appeal from the decision of a trial court. E.g., Jefferson Fire Ins. Co. v. Bierce & Sage, 183 F. 588, 590 (E.D. Mich. 1910); Myers v. Jenkins, 63 Ohio St. 101, 57 N.E. 1089, 1093 (1900). Appellee would have us adopt and apply such a rule in the instant case. We decline, however, to do so.
Whatever may have been the basis for the doctrine at common law, the rule simply does not comport with contemporary thinking about the use of extrajudicial modes of dispute resolution.[9] The dramatic increase in the volume *610 of litigation in the past 25 years and the resultant congestion of court dockets have generated a demand for alternative procedures to expedite the settlement of legal controversies. Accordingly, courts in recent years have grown more tolerant of innovative contractual devices designed to terminate disputes quickly and equitably without the need for protracted formal litigation. See, e.g., Borough of Ambridge Water Authority v. Columbia, 458 Pa. 546, 328 A.2d 498, 500 (1974) (enforcement of agreements to submit future disputes to tribunals other than courts no longer against public policy); W.J. Seufert Land Co. v. Greenfield, 262 Or. 83, 496 P.2d 197, 200-201 (1972) (agreement waiving all defenses in suit against guarantor does not violate public policy).
Of particular interest is United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950), which involved a public policy challenge to a contract clause similar in effect to the noncontestability provision at issue in the present appeal. The contractor in Moorman sought to avoid compliance with a term in a standard form government agreement making the decision of the Secretary of War final and binding as to all disputes arising under the contract. Rejecting the contractor's contention that such a provision, if implemented, would wrongfully strip him of the right to have his controversy resolved by a court of competent jurisdiction, the Supreme Court, speaking through Mr. Justice Black, declared:
"It is true that the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language.... (citation omitted). But this does not mean that hostility to such provisions can justify blindness to a plain intent of parties to adopt this method for settlement of their disputes.... If parties competent to decide for themselves are to be *611 deprived of the privilege of making such anticipatory provisions for settlement of disputes, this deprivation should come from the legislative branch of government." Id. at 462.
The thrust of these and other modern decisions is that unless clearly prohibited by statute, contractual limitations on judicial remedies will be enforced, absent a positive showing of fraud, misrepresentation, overreaching, or other unconscionable conduct on the part of the party seeking enforcement. See Wilson Trading Corporation v. David Ferguson, Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685, 687 (1968).
In his second memorandum opinion, the chancellor suggested that to uphold the challenged noncontestability clause would be to permit the state to impose an "illegal tax" upon the leasehold improvements, since were it not for the waiver provision, the Arena would have been able to prosecute an appeal to the tax appeal tribunals, where, in the chancellor's view at least, it would have succeeded in establishing tax-exempt status under Articles 81, § 8 (7) (e) and 66D, § 5-109. Once again we find ourselves unable to agree.
At the time the Lease Agreement was originally executed in 1971, as well as at the time of its assignment to appellee in 1972, a genuine doubt existed regarding the taxability of the not-as-yet constructed improvements. In fact, to this day the question of the Arena's tax-exempt status has yet to be settled conclusively by the courts of this state. Anticipating that a formal resolution of this issue might prove to be both costly and time-consuming, and recognizing that neither party could unilaterally provide a solution, the parties agreed that it was in their mutual interest to avoid lengthy appellate review of the thorny legal question by designating the Supervisor of Assessments as the final arbiter of the taxability issue.
The parties to the Lease Agreement and their assigns did not, as the chancellor opined, agree to impose an illegal tax. They merely covenanted to prevent litigation of the taxability *612 question beyond the determination of the Supervisor. Even were we to assume for the sake of argument that the Supervisor was wrong in concluding that the leasehold improvements were subject to taxation, this would not be sufficient to render the contract illegal. If, as a result of the Supervisor's decision, the tax laws were misapplied, it was through no fault of the parties, who agreed to assume the risk of such error by incorporating the noncontestability clause into the lease accord. Just how an error of law committed by a third party referee can impugn the legality of the bargain appointing the third party arbiter in the first instance is difficult to understand.
Having examined each of appellee's public policy contentions in some detail, it remains for us only to balance these policy considerations against those weighing in favor of enforcing the pertinent provisions of paragraph 6(c). As our discussion has indicated, the arguments advanced by the Arena in opposition to the noncontestability clause are hardly compelling. Absent any evidence of overreaching, fraud or misrepresentation on the part of the Commission, we cannot say that the policies identified by appellee clearly and unequivocally outweigh the reasons for giving effect to the plain and unambiguous intention of the parties manifested by the language of paragraph 6(c).
We are not confronted here with a situation in which one party seeks enforcement of a contractual provision exacted from the other as a result of the former's superior bargaining power. In such cases a court might well elect to refuse implementation. See Strong, The Enforceability of Illegal Contracts, 11 Hastings L.J. 347, 348 (1961).
The case at hand, however, presents an entirely different set of circumstances. For one thing, neither party enjoyed any appreciable bargaining advantage over the other. The close cooperation of both the Commission and the Arena was indispensable to the success of the proposed sports complex. The Commission, for its part, provided a highly desirable site for the facility, while the Arena contributed the capital and business acumen necessary to transform the ambitious plan into a viable reality. Furthermore, the Arena was controlled *613 by persons with considerable knowledge and experience in business and finance. Consequently it was no unwitting participant in the transaction. Represented by counsel at every stage of the negotiations, the Arena fully understood the import of the noncontestability clause and the nature of the rights it relinquished thereby, as well as the risks inherent in such a waiver. Under these circumstances it would be unthinkable to release appellee from its voluntarily assumed obligation on public policy grounds.
Like Lord Campbell in the landmark case of Scott v. Avery, 5 H.L. Cas. 811, 853 (1856), we "can see not the slightest ill consequences that can flow from such an agreement"; on the contrary, we "see great advantages that may arise from it." The sound policy, in our view, is to encourage parties of relatively equal bargaining strength to devise nonjudicial procedures for the resolution of anticipated controversies arising under commercial contracts. Accordingly, we hold that the noncontestability clause of paragraph 6(c) was not void as against public policy. The chancellor therefore erred in refusing to enter a declaratory decree to that effect.

III
What we have already said is largely dispositive of appellee's constitutional challenge to the waiver provision of paragraph 6(c).[10] In a word, the Arena contends that it would be a violation of its right to due process of law under the Federal and State Constitutions for a court to issue an order enforcing the prohibition against seeking administrative and judicial review of the taxability determination of the Supervisor.
The short answer to this argument is that constitutional rights, including the right to procedural due process, may be relinquished by agreement, provided any such waiver is "voluntary, knowing, and intelligently made." D.H. *614 Overmeyer Co. v. Frick Co., 405 U.S. 174, 185, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). In a sequel to its decision in Overmeyer, the Supreme Court elaborated on the factors which led it to sustain the validity of the broad waiver terms of the confessed judgment note at issue in that case:
"The contract in Overmeyer was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was `not a case of unequal bargaining power or overreaching. The Overmeyer-Frick agreement, from the start, was not a contract of adhesion.' . .. Both parties `were aware of the significance' of the waiver provision." Fuentes v. Shevin, 407 U.S. 67, 95, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). But see Isbell v. County of Sonoma, 21 Cal.3d 61, 145 Cal. Rptr. 368, 577 P.2d 188 (1978).
In the present case, there was manifestly no disparity of bargaining power. The waiver clause, like the remainder of the lease, was specifically negotiated by the parties with assistance of counsel. All participants in the negotiations were experienced in business and financial affairs and are presumed to have comprehended the meaning of the waiver term. We hold therefore that the Arena voluntarily, knowingly and intelligently waived its right to a further hearing on the taxability question by accepting assignment of the 1971 Lease Agreement and thereby suffered no deprivation of its right to procedural due process.

IV
The Arena contends finally that even if the challenged portion of paragraph 6(c) be deemed valid, the Commission should nevertheless have been denied injunctive relief. In particular it is claimed that the Commission has neither yet nor ever will suffer any irrevocable or irreparable harm as a consequence of the Arena's breach of the lease covenant, and therefore is not entitled to enjoin the administrative appeal.
*615 Generally speaking, a suit for injunctive relief will lie to restrain the breach of an express negative covenant in a lease or contract. School Committee of Boston v. Reilly, 362 Mass. 334, 285 N.E.2d 795, 798 (1972); see Foster-Porter Ent'prises v. De Mare, 198 Md. 20, 37, 81 A.2d 325 (1951); cf. Fitzpatrick v. Michael, 177 Md. 248, 258, 9 A.2d 639 (1939) (stating Maryland rule regarding the enforceability of implied negative covenants by way of injunction). An action to enforce a negative convenant is in substance a suit for specific performance. Hearn v. Ruark, 148 Md. 354, 357, 129 A. 366 (1925). Consequently the grounds for awarding injunctive relief in such cases are usually but not necessarily the same as those governing the granting of specific performance, Dr. Allison, Dentist, Inc. v. Allison, 360 Ill. 638, 196 N.E. 799, 800 (1935), although the mere fact that an agreement is one which cannot be specifically enforced by a court of equity does not preclude a decree for an injunction restraining breach of the contract. McKeever v. Realty Corp., 183 Md. 216, 223, 37 A.2d 305 (1944); see 5A A. Corbin, Contracts § 1212 (1964).
While the trial court has discretion to grant or deny specific performance in any given case, specific performance will usually be decreed, as a matter of course, where the contract is in its nature and circumstances unobjectionable, that is, fair, reasonable and certain in all its terms.[11]Hupp v. George R. Rembold Bldg. Co., 279 Md. 597, 600-601, 369 A.2d 1048 (1977). Gross v. J & L Camping & Sports, 270 Md. 539, 543-44, 312 A.2d 270 (1973). On the other hand, injunctive relief will not normally issue unless the complainant demonstrates that he sustained substantial and irreparable injury as a result of the wrongful conduct. Salisbury v. Camden Sewer Co., 135 Md. 563, 572, 109 A. 333 (1920). Such injury, however, need *616 not be beyond all possibility of compensation in damages, nor need it be very great. Hart v. Wagner, 184 Md. 40, 47-48, 40 A.2d 47 (1944); Smith v. Shiebeck, 180 Md. 412, 422, 24 A.2d 795 (1942). Thus, it has been held that irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate. Glasco v. Hills, 558 F.2d 179, 181 (3d Cir.1977); Danielson v. Local 275, Laborers Union, 479 F.2d 1033, 1037 (2d Cir.1973).
We think the ends of justice would have been best served in this case by the issuance of the requested injunction. The damages sustained by the Commission as a consequence of the breach would not have been susceptible of precise monetary valuation. The fact that the Arena may have been liable for additional rent in the amount of $325,000 is of no consequence, since the express covenant not to contest was entirely independent of the provisions governing the obligation to pay additional rent. Furthermore, this was not a suit to recover the stipulated rent; it was a suit to prevent appellee from ever prosecuting an appeal in violation of the noncontestability clause. The Commission was substantially harmed by the mere institution of administrative proceedings to challenge the taxability determination of the Supervisor  an injury the additional rent payments were never intended to compensate.
Since, as we now hold, the chancellor erred in failing to grant the Commission's request for injunctive relief, this case must be reversed and remanded with instructions to enter a decree conformable to this opinion.
Judgment of the Court of Special Appeals reversed; remanded to that court with instructions to reverse the decree of the Circuit Court for Prince George's County and to remand to that court with instructions to enter a decree in conformity with the views expressed herein; costs to be paid by appellee.
NOTES
[1] Maryland Code (1957, 1970 Repl. Vol., 1977 Cum. Supp.), Art. 66D, § 5-109 (a) provides in pertinent part:

"(a) All land or other property acquired by the [Maryland-National Capital Park and Planning] Commission for the purposes specified hereinabove, or any of them, shall be exempt from State, county, and municipal taxes."
[2] All parties in the present matter concur that the 1971 lease did not restrict the right of the Arena to challenge the taxability of the land on which the complex was erected. The prohibition applied only to the question whether the improvements were subject to the property tax.
[3] In the meantime, we were informed at oral argument, the Property Tax Assessment Appeal Board, reversing the decision of the Supervisor of Assessments, held the Capital Centre improvements to be tax-exempt. This decision was later affirmed by the Maryland Tax Court which declined to rule on whether the Arena was barred by the 1971 Lease Agreement from maintaining an administrative appeal on the taxability issue.
[4] Other than Pennsylvania, Maryland is the only jurisdiction in the United States having an express statutory provision which restricts the applicability of the Uniform Declaratory Judgments Act in cases where the legislature has created an alternative statutory remedy. Elsewhere, however, this principle has been recognized by judicial decision. E.g., Katzenbach v. McClung, 379 U.S. 294, 296, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). For a discussion of the history of the Maryland Declaratory Judgments Act and § 3-409 (b) in particular, see Ryan v. Herbert, 186 Md. 453, 460, 47 A.2d 360 (1946); Note, 8 Md. L. Rev. 237, 239-40 (1944); and see State Dep't of A. & Tax. v. Clark, 281 Md. 385, 391, 380 A.2d 28 (1977).
[5] Although we have not referred to the doctrine by name in prior decisions, the primary jurisdiction principle has been invoked on at least one occasion in the past. E.g., Miller Brothers Company v. State, 201 Md. 535, 540, 95 A.2d 286 (1953), rev'd on other grounds, 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954).
[6] For an explanation of the policies underlying the exhaustion rule, see Soley v. St. Comm'n on Human Rel., 277 Md. 521, 526-27, 356 A.2d 254 (1976).
[7] For a more detailed discussion of the public policy doctrine, see Gellhorn, Contracts and Public Policy, 35 Colum. L. Rev. 679 (1935); Shand, Unblinkering the Unruly Horse: Public Policy in the Law of Contract, 30 Camb. L.J. 144 (1972); Strong, The Enforceability of Illegal Contracts, 11 Hastings L.J. 347 (1961); Symmons, The Function and Effect of Public Policy in Contemporary Common Law, 51 Austl. L.J. 185 (1977).
[8] Factors weighing against enforcement of a contractual term for reasons of public policy include:

a) the strength of that policy as manifested by legislation and judicial decisions;
b) the likelihood that a refusal to enforce the term will further that policy;
c) the seriousness of any misconduct involved and the extent to which it was deliberate;
d) the directness of the connection between that misconduct and the challenged term.
Restatement (Second) of Contracts § 320 (3) (Tent. Draft No. 12, 1977).
[9] Although it is difficult to be certain, the traditional bias against contractually established nonjudicial alternatives to litigation may have been due to a desire on the part of the courts to preserve their historic function as the exclusive tribunals for settlement of common law disputes. See The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). In addition, prior to the advent of modern constitutional safeguards and the contemporary rules of unconscionability, the common law doctrine may have been used to protect unwary and unsophisticated debtors against the total deprivation of judicial recourse in commercial controversies. See, e.g., First Nat. Bank v. White, 220 Mo. 717, 120 S.W. 36, 41-42 (1909).
[10] As we noted previously, the chancellor disposed of the Commission's suit for declaratory and injunctive relief solely on public policy grounds, and therefore did not have occasion to reach the constitutional and other remaining defenses asserted by the Arena. To avoid the expense and delay of another appeal to this Court, we shall decide these additional claims even though they were not adjudicated by the circuit court. Maryland Rule 885; Mont. Co. v. Md. Soft Drink Ass'n, 281 Md. 116, 122-23, 377 A.2d 486 (1977).
[11] Appellee claims that the noncontestability clause is ambiguous and uncertain due to the use of the phrase "State assessor," a title which does not appear anywhere in the revenue statutes. This obvious misnomer is not sufficient in our view to render the provision unsuitable for specific performance. We think it clear that in referring to the "State assessor," the parties meant to designate that functionary of the State Department of Assessments and Taxation who had sole responsibility for the initial assessment of real estate  i.e. the Supervisor of Assessments. See Montgomery Co. v. Ian Corp., 282 Md. 459, 462, 385 A.2d 80 (1978).